715 A.2d 365 (1998)
314 N.J. Super. 500
STATE of New Jersey, Plaintiff-Respondent,
v.
Andrew LAZARCHICK, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 25, 1998.
Decided September 3, 1998.
*367 Richard S. Lehrich, Cranford, for defendant-appellant.
Richard P. Rodbart, Deputy First Assistant Prosecutor, for plaintiff-respondent (Thomas V. Manahan, Union County Prosecutor, attorney; Mr. Rodbart, on the brief).
Before Judges KING,[1] KESTIN and CUFF.
*366 The opinion of the court was delivered by KESTIN, J.A.D.
Defendant, Andrew Lazarchick, appeals from convictions for disorderly persons assault, N.J.S.A. 2C:12-1a, and petty disorderly persons harassment, N.J.S.A. 2C:33-4a, after a trial de novo on the record in the Law Division, R. 3:23-8; and from the Law Division's declination to review an order entered pursuant to N.J.S.A. 2C:51-2a requiring forfeiture of defendant's employment as a police officer. Defendant had previously been found guilty of the charges in the Elizabeth Municipal Court, where the forfeiture order was entered as a consequence of the convictions. We affirm.

I
The charges against defendant were contained in a cross-complaint. Defendant had issued two traffic summonses to Isidro (Isadore) Cruz, II, the 17-year old son of the complainant, Isidro Cruz. The cases were consolidated for trial in the Municipal Court with a private attorney acting as prosecutor on the Cruz complaint against defendant, and defendant's attorney acting as prosecutor of the traffic offense charges. Young Cruz was acquitted of the motor vehicle charges against him.
On July 2, 1995, defendant, a police officer with the Elizabeth Police Department, was in a patrol car driven by his partner, Officer Martin Starr. The patrol car veered into a telephone pole to avoid colliding with a red car which had stopped in an intersection. The red car was driven by Isadore Cruz, II. Defendant claimed that Cruz had run a stop sign. Cruz claimed that he had not, but had merely stopped because he heard the police siren and froze when he was unable to see where the sound was coming from. Cruz stated that the flashing lights on the patrol car were off, and remained off until after the accident. Defendant claimed that the lights were on.
Defendant's testimony opened the consolidated trial on the cross-complaints. Defendant testified that Cruz did not get out of the *368 car on his own initiative after the accident. Cruz was asked for his license, registration and insurance card; and, because he did not immediately produce them, defendant asked him to step out of the car. When he did not, defendant opened the car door on the driver's side, grasped Cruz by the left wrist, and "escorted" him out of the car and over to the patrol car, where he asked Cruz to put his hands on the trunk. Defendant stated that at one point while he was patting Cruz down, Cruz turned towards him; defendant grabbed him by the wrist and neck and forced him back onto the trunk of the car. Then, defendant seated Cruz in the rear of the patrol car because he seemed "nervous"; and defendant radioed for backup. He denied touching Cruz's wallet, claiming that Cruz gave him the appropriate documents. Within moments, backup arrived in the form of two police officers, Meola and Hurler. They took over all dealings with Cruz while defendant stayed with his partner, who had been injured in the accident. Defendant handed Officer Meola two summonses he had written charging Cruz with failure to yield to an emergency vehicle and going through a stop sign.
Cruz's version of events varied greatly from that of defendant. The young man claimed that after the police car struck the pole, he got out of his car to run over and see how its occupants were. He testified that defendant charged at him, grabbed him by the throat, and punched him in the nose. Then, defendant grabbed him by the nape of the neck and began to push him towards the police car, punching him in the back as they proceeded. When they got to the car, defendant allegedly pushed Cruz onto the trunk of the car, continuing to punch him. Cruz testified that defendant threw six or seven punches altogether. Cruz also testified that defendant was uttering angry profanities throughout, including the questions: "What are you, an f'ing idiot? What are you stupid? What were you looking for, hookers?" Cruz stated that when he attempted to explain that he was on his way home from his girlfriend's house, defendant responded by remarking, "What is your girlfriend, an f'ing hooker?" Defendant patted Cruz down while Cruz was still trying to explain, then grabbed him by the back of his shirt and "firmly," but not roughly, led Cruz to the rear of the car, and had Cruz sit in the back seat. Defendant then searched Cruz's wallet, laying out its contents on the trunk of the car. Cruz was bleeding from the nose at this point. Cruz claimed that when Officers Meola and Hurler arrived, he tried to tell them how defendant had treated him, but neither would listen to him on the subject. They asked Cruz if he wanted to go to the hospital, but he declined and went home.
Officer Starr's testimony followed defendant's. Starr was disoriented during the critical events because of the impact of the accident, to the point of having been dazed or even having lost consciousness. He did not witness what transpired between Cruz and defendant. The testimony of Officers Meola and Hurler followed Starr's. They stated that Cruz appeared upset at the scene, but they denied seeing any blood, or that Cruz had a bloody nose or any other injury they perceived at the time. They acknowledged asking Cruz if he wanted to go to the hospital.
Cruz also testified that when he arrived home, he told his mother, Barbara Cruz, what had happened and showed her his bruises. Then he cleaned up, wiped the blood from his nose, changed out of his bloody T-shirt and went to bed. The following morning, his nose was still bleeding and Cruz went to the emergency room at Union Memorial Hospital.
The testimony of Barbara Cruz, Isadore's mother, corroborated that of her son, and her credibility was particularly noted by Municipal Court Judge Russell. Mrs. Cruz testified that Isadore had arrived home "hysterical" and told her "I just got beat up by a cop." She observed that his nose was bleeding and his T-shirt was bloody. Over defense objections, Mrs. Cruz related to the court what her son told her had transpired between him and defendant. She explained that she did not awaken her husband because she did not know what he might do, fearing he might get himself in trouble by reacting impulsively. Mrs. Cruz also testified about the blood on her son's pillow the next morning, *369 and identified the bruises she had seen on her son from a photograph that was taken the morning after the incident. A hospital report from Union Memorial Hospital indicated that Cruz's nostrils showed "evidence of recent nosebleed," and Cruz's head had "contusions or abrasions."
Judge Russell found defendant guilty as charged, and acquitted Isadore Cruz of the motor vehicle violations. The judge was clear about the basis for his decision:
This comes down to a question of credibility of witnesses. Do I believe Lazarchick? Do I believe Mr. Cruz? However, ... [t]here is actually concrete evidence. There's direct testimony from [Cruz's] mother, as I said, whom I believe.... No way that woman was telling me anything that wasn't true. I have photographs showing injuries that directly contradict what Lazarchick is telling.
* * * *
This is a police officer carrying a weapon. He's carrying a gun. He's out of control. If he does this, what else could he do? This kind of a case frightens me. Five years on the police force. I get Officer Meola and Hurler coming in here, and they don't remember anything. They give me a cock and bull story about ... calling the.... ambulance because somebody seems nervous. I don't believe that. [Y]ou ask a person whether they want to go to the hospital because of the fact that they're injured.
In effect, Mr. Cruz, I can understand why he was nervous. I would have been nervous, too, if I had a police officer just smack me up against the head. I'd be upset, too, if I were 17 years old and experiencing this six months after I was driving.
Some eight weeks later, on December 12, 1996, Judge Russell, pursuant to N.J.S.A. 2C:51-2a, entered an order of forfeiture regarding defendant's employment as an Elizabeth police officer. Defendant's counsel had requested a waiver of the statutory forfeiture provision, but Acting Prosecutor Neafsey wrote to the court that the "good cause" that was the statutorily mandated prerequisite for waiver, N.J.S.A. 2C:51-2e, was not present; and he therefore declined to exercise his statutory prerogative to request it. At sentencing, on December 13, 1996, the defense moved for reconsideration of the forfeiture order, which was denied, as was defendant's application for a stay of the order. All fines, assessments, community service and probation were stayed pending appeal, however. On that same day, defendant filed a notice of appeal. An emergent application for a stay of the forfeiture order was denied by the Law Division.
The appeal was tried de novo on the record before Judge Triarsi on December 24, 1996. Defendant was found guilty of both charges. The Law Division assessed no fines as the Municipal Court had; concurrent one-year terms of probation and fifteen hours of community service were ordered, along with the costs ($30) and statutory assessments ($50 VCCB and $75 SSCP) previously imposed by the Municipal Court as to each count. On January 22, 1997, pursuant to a consent order, the sentence was modified by Judge Triarsi; defendant was discharged from probation and relieved of the community service obligation.

II
On appeal, defendant raises the following issues:
POINT I VARIOUS PROCEDURAL DEFECTS IN THE TRIAL BELOW VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHTS AND OPERATED, SEPARATELY AND TOGETHER, TO DENY DEFENDANT A FAIR TRIAL, WARRANTING A REVERSAL OF HIS CONVICTIONS (NOT RAISED BELOW).
POINT II DEFENDANT'S CONVICTIONS ARE AGAINST THE WEIGHT OF THE EVIDENCE, AND THEY RESULTED, IN PART, FROM A MISAPPLICATION OF THE LAW AND THE ERRONEOUS ADMISSION OF HEARSAY EVIDENCE.

POINT III BOTH COURTS BELOW ERRED IN CONCLUDING THAT DEFENDANT IS NOT ENTITLED *370 TO A HEARING ON THE ACTING UNION COUNTY PROSECUTOR'S REFUSAL TO APPLY FOR A WAIVER OF THE FORFEITURE OF DEFENDANT'S EMPLOYMENT PURSUANT TO N.J.S. 2C:51-2e, AND IN ORDERING THAT DEFENDANT'S EMPLOYMENT BE FORFEITED.

III
Three procedural defects are urged: that Judge Russell did not recuse himself sua sponte; that the Municipal Court did not adhere to the requirements of State v. Storm, 141 N.J. 245, 661 A.2d 790 (1995), mandating a certain procedure in cases where private prosecutors are employed; and that the consolidation of the complaint against defendant with the case against Isadore Cruz, resulted in a strategic disadvantage which denied defendant a fair trial.

A

Recusal Vel Non of the Municipal Court Judge
Defendant argues there is an appearance of impropriety when municipal court judges preside over cases involving the misconduct of local police officers, and that it is therefore common practice among "many of the municipal courts" in New Jersey to transfer any such case to a judge of another locality. He acknowledges that the basis for any supposed impropriety is the idea that municipal court judges may be seen to be biased in favor of police officers from their own municipality, with whom they have likely had dealings in the past and will probably be obliged to have relations on future occasions. Defendant maintains that there is also a danger that a municipal court judge in "bending over backwards" to be fair, will act to the disadvantage of the police officer; and that this, in fact, happened in the present case.
The State characterizes the latter allegation as "mere speculation." Defendant points to nothing in the record indicating bias on Judge Russell's part. To the contrary, at one point, Judge Russell remarked:
I didn't make this decision with any pleasure. I will inform everyone sitting in this courtroom that I took an oath to apply the law as I saw fit fair[ly] and impartially. I did it in this case. And the day that I can't do that, the day that I bow to some sort of pressure because I get 100 police officers sitting here looking at me, I'll take this robe off and throw it in the garbage can.
On the basis of the record before us, it is not necessary to evaluate the wisdom of a transfer policy in cases involving alleged misconduct of local police officers. There is no statute or rule currently in place which requires such a transfer,[2] and there has been no showing of any unfairness to defendant or any appearance of impropriety by reason of Judge Russell's failure to order an unrequested transfer of this case to another municipality. Judge Russell's comments cited by defendant as indicative of the judge's lack of impartiality occurred after defendant was found guilty as charged. They concern defendant's unfitness to serve as a police officer because he had demonstrated an extraordinary lack of self control, and then lied about it. There is no indication in the record of any bias against defendant on the part of Judge Russell in adjudicating the charges.

B

The Mandate of State v. Storm
R. 7:4-4(b) permits prosecution of criminal complaints by private attorneys "if the Attorney General, county or municipal court prosecutor or municipal attorney does not appear[.]" New Jersey is one of several states, including Alabama, Kansas, Minnesota, Oregon, Tennessee, and West Virginia, specifically authorizing private prosecution of criminal complaints. See John D. Bessler, The Public Interest and the Unconstitutionality of Private Prosecutors, 47 Ark. L.Rev. 511, 529 n. 74 (1994). Other states permit private *371 prosecution only when under the control of public prosecutors,id. at 521, or simply permit it without specific statutory authorization, id. at 529; and some jurisdictions eschew the practice altogether, id. at 521.
Private prosecution as an institution is rooted in the English common law practice which generally relied on the victim, or the victim's relatives and friends, to prosecute criminals. Id. at 515. It "has been sharply criticized on the ground that it is inherently and fundamentally unfair." 63C Am.Jur.2d Prosecuting Attorneys § 12, at 124 (1997). Public prosecutors, though "`permitted to be zealous in their enforcement of the law,'" Young v. United States ex. rel. Vuitton et Fils S.A., 481 U.S. 787, 807, 107 S.Ct. 2124, 2137, 95 L. Ed.2d 740 (1987) (citation omitted), are required to be disinterested. Ibid. That is, "they are required to seek the truth and not merely to obtain convictions." Joseph E. Kennedy, Private Financing of Criminal Prosecutions and the Differing Protections of Liberty and Equality in the Criminal Justice System, 24 Hastings Const. L.Q. 665, 672 (1997). The United States Supreme Court has recognized the essential difference between public prosecutors, who ostensibly aim at impartiality, and private prosecutors, who are committed to a client:
It is true that prosecutors may on occasion be overzealous and become overly committed to obtaining a conviction. That problem, however, is personal, not structural.... "[It] does not have its roots in a conflict of interest. When it manifests itself the courts deal with it on a case-by-case basis as an aberration. This is quite different from approving a practice which would permit the appointment of [private] prosecutors whose undivided loyalty is pledged to a party interested only in conviction."
[Young, supra, 481 U.S. at 807 n. 18, 107 S.Ct. at 2138, 95 L. Ed.2d at 759 (quoting Polo Fashions, Inc. v. Stock Buyers Int'l, Inc., 760 F.2d 698, 705 (6th Cir. 1985), cert. denied, 482 U.S. 905, 107 S.Ct. 2480, 96 L. Ed.2d 373 (1987)).]
The New Jersey Supreme Court, in State v. Storm, supra, was fully cognizant of the conflict of interests inherent in private prosecution:
A private prosecutor's dual responsibilities to the complaining witness and to the State breed numerous problems. Representation of the complainant in a related civil action could invest the prosecutor with a monetary interest in the outcome of the matter. That risk is particularly high if the prosecutor has agreed to receive a contingent fee in the civil action. Even in the absence of actual conflict, the appointment as prosecutor of an attorney for an interested party creates the appearance of impropriety.
Conflicting interests ... can undermine a prosecutor's impartiality.... [T]he prosecutor [has an] ethical obligation "to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." In addition, private prosecutions pose the risk that the complainant will use the municipal court proceeding to harass the defendant or to obtain an advantage in a related civil action.
[Storm, supra, 141 N.J. at 253, 661 A.2d 790 (citations omitted).]
On the other hand, private prosecution plays an important role in the municipal court system, where, because of the large volume of cases disposed of, public prosecutors limit their involvement for the most part to complaints signed by police officers. Id. at 251, 661 A.2d 790. Permitting private citizens to appear either pro se or through private attorneys in the municipal courts "facilitates access" to those courts. Ibid. Without private prosecution, "some wrongs would not be set right." This is "the best argument" for permitting the practice. Id. at 252, 661 A.2d 790.
The Storm Court instructed the Committee on Municipal Courts to devise guidelines for the use of private prosecutors. Id. at 255, 661 A.2d 790. These guidelines are still being developed. However, the Court outlined an interim procedure that was to be followed by attorneys acting as private prosecutors. They are to
notify the municipal prosecutor and the court. If the municipal prosecutor insists *372 on proceeding with the prosecution, the prosecutor's decision should be final. In all other cases, the private attorney should disclose in a written certification all facts that foreseeably may affect the fairness of the proceedings. The propriety of appointing a private prosecutor will vary from case-to-case, depending on the facts of each case.

[Id. at 255, 661 A.2d 790.]
Defendant points out that the interim procedure established in Storm was not followed in the present case. The day after all testimony had been received in Elizabeth Municipal Court and just before making his findings and adjudicating the charges, Judge Russell asked the private prosecutor representing Cruz whether he had submitted the certification required by Storm. Counsel replied that he had not. The court inquired about his ability to file a certification indicating that he was not involved in any civil suit related to the case, and had no retainer agreement with regard to any such suit. Counsel assured the court that he was indeed able to submit the requested certification and would do so. The court found this sufficient.
In view of the concerns expressed in Storm about private prosecution in general, it is worrisome that its interim procedure was not strictly followed here. The nature of this particular suita complaint against a police officeris one that might well be among those calculated to "harass the defendant or to obtain an advantage in a related civil action," Storm, supra, 141 N.J. at 253, 661 A.2d 790. The Supreme Court, in Storm, addressing important due process considerations, attempted to reconcile New Jersey's pedigreed practices concerning private prosecutors with the practical requirements of the municipal court system. It established a temporary modus vivendi for implementation until a more satisfactory and durable plan could be devised. It is not appropriate for attorneys or municipal court judges to ignore that procedure as though it were of no moment, or to comply with it as an afterthought.
We cannot characterize the private prosecutor's actions in the present case as substantial compliance with Storm's interim requirement; it was obviously the Supreme Court's intention that the mandated procedures take place before trial, not after. Nevertheless, there has been no showing of any prejudice to defendant from the failure to follow the letter of Storm. We decline defendant's invitation to view Storm's interim procedures as a per se rule. In the absence of a particularized prima facie showing that the prosecutor's impartiality was subject to being compromised in any way, we regard the error committed to have been harmless.
We are constrained to note an apparent irony in connection with defendant's argument based on Storm, without attributing any substantive effect to it. The complaint against Cruz, based upon the two traffic offense summonses defendant had issued to him, was also prosecuted by private counsel, the attorney retained to represent defendant on the cross-complaint. As far as we can discern from the record, that attorney also failed to file the pretrial certification required by Storm.

C

Consolidation and Fundamental Fairness
R. 7:4-2(g) states:
The court may order that 2 or more complaints be tried together if the offenses arose out of the same facts and circumstances, regardless of the number of defendants. In all other matters, with the consent of the persons charged, the court, for convenience, may consolidate the complaints for trial.
Defendant argues that it is not clear whether consolidation applies to cross-complaints, as well as to co-defendants. In this matter, the second sentence of the rule is answer enough to that question.
More significantly, defendant urges that criminal defendants have the right to put the State to its proof, and argues that he was deprived of that right. Defendant concedes that if the two complaints were correctly consolidated for trial, it was appropriate for his evidence to be taken first. He argues, nevertheless, that the decision to consolidate was erroneous for that very reason: the necessary *373 effect of trying the complaints together was to require defendant to present affirmative proofs at the outset rather than to permit himas every defendant may by rightto await the introduction of evidence against him by the prosecutor and to meet only those proofs presented against him.
The procedural choice to consolidate was broached in a question posed by Judge Russell at the outset of the municipal court trial:
THE COURT: All right, fine. Now how do we intend to proceed in this case this evening? My thought, quite frankly, would be to have [defense counsel's] client testify first, and then ... have [the prosecutor's] client.
[MR. CRUZ'S ATTORNEY]: I have no objection.
THE COURT: Is that satisfactory, gentlemen?
[DEFENDANT'S ATTORNEY]: I have no objection to that procedure at all.
Defendant makes two arguments which are interrelated in this regard: one bearing upon his right to a fair trial and the other upon his right to effective assistance of counsel. Although his attorney agreed to consolidation and the order of witnesses at trial, defendant now asserts severance was necessary because defendant's right against self-incrimination was effectively compromised by the decision to have him "go first" in testifying. See Zafiro v. United States, 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L. Ed.2d 317, 325 (1993) (stating that severance should be granted by federal district courts "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"). Defendant argues further, relying extensively upon State v. Buonadonna, 122 N.J. 22, 583 A.2d 747 (1991), that his trial attorney's acquiescence, effectively waiving defendant's prerogative to put the prosecution to its proof before presenting his own case, generated so fundamental an error as to constitute ineffective assistance of counsel.
Buonadonna deals with the requirements for the effective waiver of constitutional rights. It distinguishes between the waiver of fundamental rights, such as the right to counsel, which requires an on-the-record inquiry by the trial court to establish that the waiver is knowing and voluntary; and the waiver of "substantial rights that implicate the Constitution but are not explicitly identified therein." Id. at 35, 583 A.2d 747. The latter, styled "intermediate rights" by the Buonadonna Court, do not require an on-the-record inquiry, although it is counsel's duty to explain the ramifications of waiver to the client beforehand. Ibid. Cf. State v. Heitzman, 209 N.J.Super. 617, 622, 508 A.2d 1161 (App.Div.1986), aff'd, 107 N.J. 603, 527 A.2d 439 (1987) (with regard to guilty plea, defendant must be informed by the court only of penal consequences, not collateral ones such as loss of employment).
Defendant contends that his effective waiver of the right to have the prosecutor make out a case against him before deciding whether or not to testify or which, if any, witnesses to call on his own behalf, obligated the trial court to make an on-the-record inquiry of defendant as to whether the waiver was knowing and voluntary. There are certain problems with this analysis, not the least of which is that even the Sixth Amendment right to counsel applies to felony cases only, not misdemeanors. See State v. Laurick, 120 N.J. 1, 7, 575 A.2d 1340, cert. denied sub nom. Laurick v. New Jersey, 498 U.S. 967, 111 S.Ct. 429, 112 L. Ed.2d 413 (1990) (citing Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L. Ed.2d 799 (1963) and Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L. Ed.2d 530 (1972)). In New Jersey, the labels governing the distinction are indictable and non-indictable (disorderly persons) offenses. Ibid. In Rodriguez v. Rosenblatt, 58 N.J. 281, 277 A.2d 216 (1971), however, the New Jersey Supreme Court did not stand on this distinction when it determined that, though it was not always constitutionally compelled, "as a matter of simple justice, no indigent defendant should be subjected to a conviction entailing imprisonment in fact or other consequence of magnitude without first having had due and fair opportunity to have counsel assigned without cost." Laurick, supra, 120 N.J. at 8, 575 A.2d 1340 (quoting Rodriguez v. Rosenblatt, supra, 58 N.J. at 295, 277 A.2d 216).
*374 Defendant here was charged with and convicted of simple assault, a disorderly persons offense, and harassment, a petty disorderly persons offense. The sentence ultimately imposed was non-custodial and without fines; and a subsequent consent order discharged defendant from the year-long probationary term and fifteen days of community service which had been imposed. Thus, defendant's constitutionally guaranteed rights are not implicated in his waiver.
This does not necessarily dispose of defendant's rights under New Jersey's doctrine of fundamental fairness, however. Considerations of that type are triggered when, even though constitutional rights have not been violated, there has nevertheless been some significantly unfair treatment. The concept as applied in our State
"serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily. [It] serves, depending on the context, as an augmentation of existing constitutional protections or as an independent source of protection against state action." This unique doctrine is not appropriately applied in every case but only in those instances where the interests involved are especially compelling.
[Doe v. Poritz, 142 N.J. 1, 108, 662 A.2d 367 (1995) (citing State v. Ramseur, 106 N.J. 123, 373, 524 A.2d 188 (1987) (Handler, J., dissenting)).]
For example, the doctrine of fundamental fairness served as the underpinning for the holding in Rodriguez v. Rosenblatt, supra, 58 N.J. 281, 277 A.2d 216, requiring that counsel be provided to indigents in municipal court cases in which imprisonment or other "consequence[s] of magnitude" are likely to ensue, id. at 295, 277 A.2d 216, where no specific constitutional basis for such a requirement existed.
Manifestly, defendant had no on-the-record input either in the decision to consolidate the two cases, or with respect to the order of proofs. The complaint filed against him typically contained no factual detail and could not itself have prepared defendant for the evidence and testimony he could expect to face at trial. The effect of consenting to consolidation and the order of proofs, defendant now argues, was a waiver of the proof-beyond-a-reasonable-doubt requirement regarding every element of the offense, and defendant's fundamental right to be considered innocent unless each element is proven beyond a reasonable doubt. See, 33 New Jersey Practice, Criminal Law § 14, at 48 (Gerald D. Miller) (2d ed. 1990).
It is the determination to consolidate that is the key issue, for if the cases were properly consolidated, it is obvious that one of the parties would need to have gone first in presenting proofs. As we have noted, defendant has conceded that ordinarily, where there is a complaint by a police officer and a cross-complaint against that officer, the police officer appropriately testifies first. It is in this connection particularly, that defendant suggests that, in the face of the obvious consequences, his counsel's accession to consolidation amounted to a lack of the effective assistance of counsel to which all defendants are entitled.
The State argues that defendant's trial counsel performed ably, and that any tactical decisions on the part of the defense had no effect upon the ultimate result. The record supports that argument. In whatever order presented, the testimony by Cruz and his mother, and the evidence provided by the hospital records, would have been equally persuasive. Conceivably, defendant might have refused to testify. It is difficult to imagine, however, how that would have advanced his case. Officers Meola and Hurler might have been called to rebut the Cruz's evidence instead of testifying immediately following defendant and Officer Starr, but it is doubtful that the result of the bench trial would have been changed by a different positioning of their testimony that they saw no blood on Cruz at the scene, but nevertheless asked Cruz if he wanted to be taken to the hospital.
To establish a claim of ineffective assistance of counsel, a two-prong test is applied. First, it is necessary to show that counsel's performance was deficient. Second, it must be shown that there is "`a reasonable probability *375 that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" State v. Preciose, 129 N.J. 451, 463-64, 609 A.2d 1280 (1992) (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L. Ed.2d 674, 698 (1984)). See also State v. Fritz, 105 N.J. 42, 58, 519 A.2d 336 (1987). In this case, the question can be determined on the record. See Preciose, supra, 129 N.J. at 460, 609 A.2d 1280 (where "claims [of ineffective assistance of counsel] involve allegations and evidence that lie outside the trial record" they should be addressed in a post-conviction relief proceeding).
Since the prejudice tine of the two-prong test is not satisfied, any ineffective assistance of counsel claim must fail. Additionally, given the circumstances and the procedural necessity, when dealing with a complaint and a cross-complaint, for one of the two parties to testify first, we do not discern the marked unfairness to defendant required for application of fundamental fairness principles. See, e.g., Doe v. Poritz, supra, 142 N.J. at 108, 662 A.2d 367 (quoting State v. Yoskowitz, 116 N.J. 679, 712, 563 A.2d 1 (1989)) (Garibaldi, J., concurring and dissenting) (doctrine to be "`sparingly applied'" only in "`those rare cases where not to do so will subject [a party] to oppression, harassment, or egregious deprivation'"); State v. Baker, 310 N.J.Super. 128, 138, 708 A.2d 429 (App.Div.1998) ("unlawful or unconscionable acts" of Prosecutor require remedy because toleration of them would erode public confidence in judicial process). Our analysis of the situation suggests no need for the fundamental fairness failsafe that is to be applied when the justice of the situation suggests a need for a remedy, but "when the scope of a particular constitutional protection has not been extended to protect a defendant." State v. Yoskowitz, supra, 116 N.J. at 705, 563 A.2d 1. For example, New Jersey's fundamental fairness doctrine has been invoked where double jeopardy principles are an issue, but the developed jurisprudence has no direct application in the context of the particular facts. See State v. Gallegan, 117 N.J. 345, 355, 567 A.2d 204 (1989) ("We have always recognized the interaction between principles of double jeopardy and fundamental fairness"). See also, e.g., State v. Tropea, 78 N.J. 309, 394 A.2d 355 (1978) (second trial for traffic violation precluded based on fundamental fairness, not double jeopardy, where State failed to produce proof of speed limit at trial); State v. Currie, 41 N.J. 531, 539, 197 A.2d 678 (1964) (in double jeopardy cases, "the emphasis should be on underlying policies rather than technisms," and "fairness and fulfillment of reasonable expectations in the light of ... constitutional and common law goals"); State v. Baker, supra, 310 N.J.Super. at 138-39, 708 A.2d 429 (mistrial caused by prosecutorial misconduct precludes capital punishment where loss of carefully selected jury prejudiced defendant); State v. Dunns, 266 N.J.Super. 349, 377-78, 629 A.2d 922 (App.Div.), certif. denied, 134 N.J. 567, 636 A.2d 524 (1993) (prosecutorial good faith argued against double jeopardy as a bar to retrial, but speedy trial issues preclude third trial as a matter of fundamental fairness).
The doctrine of fundamental fairness entails a balancing test designed "to avoid arbitrariness [and] reflect[ing] an equation between individual rights and government action." See Gallegan, supra, 117 N.J. at 356, 567 A.2d 204 (citing Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L. Ed.2d 18 (1976)). Weighing the alleged unfairness to defendant, which involved no arbitrary or malicious State conduct; the minimal degree to which defendant was prejudiced, if at all; and the unlikelihood that any retrial would yield a different result in the light of the facts; we hold that the doctrine of fundamental fairness does not require a reversal of the convictions.

IV
Judge Triarsi, on de novo review, determined that much of Barbara Cruz's testimony had been improperly admitted by Judge Russell because it was hearsay not within any exception. Nevertheless, defendant, in arguing that the convictions were against the weight of the evidence, maintains that Judge Triarsi was influenced by the inadmissible hearsay, and consequently deferred excessively to Judge Russell's findings.
*376 Although Judge Triarsi found that the portion of Mrs. Cruz's testimony in which she simply repeated to the court the version of events narrated to her by her son ought to have been excluded, he found the following testimony about what transpired that evening after Cruz awakened his mother admissible as an excited utterance:
MRS. CRUZ: And I said, "what's the matter?" I [sic] said, "I just got beat up by a cop." I said, "Oh, my God." So we went outside ... into the hallway, and we went downstairs. And his nose was bleeding, so I took a tissue, and I was wiping him down.
The balance of the story young Cruz told his mother was excluded as inadmissible hearsay, but the mother's testimony about her own observations of her son's demeanor and condition as she spoke to him was clearly admissible.
Excited utterance is
[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate.

[N.J.R.E. 803(c)(2).]
In ruling on whether to admit hearsay under the excited utterance exception, the court "must determine whether the declarant had the opportunity for deliberation, reflection, or misrepresentation before he made the statement, or whether the statement was truly spontaneous and made solely under the stress of excitement." Biunno, New Jersey Rules of Evidence, comment 1 on N.J.R.E. 803(c)(2) (1997). See also State v. Williams, 106 N.J.Super. 170, 173, 254 A.2d 538 (App. Div.), certif. denied, 55 N.J. 78, 259 A.2d 228 (1969), cert. denied sub nom. Williams v. New Jersey, 397 U.S. 1057, 90 S.Ct. 1405, 25 L. Ed.2d 675 (1970) (court has discretion to exclude evidence where due to interval between declaration and the time of previous event, "it concludes that there is no reasonable basis for finding that a continuity of [the previous] state of mind exists").
In deciding whether or not there was opportunity to fabricate or deliberate, the court must consider
the element of time, the circumstances of the incident, the mental and physical condition of the declarant, and the nature of the utterance (whether against the interest of the declarant or not, or made in response to questions or involuntary).
[State v. Williams, supra, 106 N.J.Super. at 172, 254 A.2d 538.]
After consideration of the facts, and the declarant's state of mind, the trial judge may deem the test for admissibility as an excited utterance met when "the circumstances reasonably warrant the inference that the statement was made as an uncontrolled response to the shock of the event before reasoned reflection could have stimulated a self-serving response." Cestero v. Ferrara, 57 N.J. 497, 504, 273 A.2d 761 (1971).
Precedents demonstrate how fact-specific the excited utterance inquiry may be. The precise amount of time elapsed between the declarant's statement and the excitement-producing event is not determinative. See, e.g., In re Registrant, C.A., 146 N.J. 71, 98-99, 679 A.2d 1153 (1996) (hearsay reliable where rape victim called police in "emotional and upset state, to report a rape," and then repeated story when hospitalized for post-traumatic stress disorder); State v. Lyle, 73 N.J. 403, 411-13, 375 A.2d 629 (1977) (victim's statement admissible where he fled half-clothed for fear of defendant and, two minutes later, described what had transpired to his sister); Cestero v. Ferrara, supra, 57 N.J. at 502-505, 273 A.2d 761 (accident victim's statement to doctor admissible where utterance was made shortly after her "return to reality" after being dazed or unconscious, and made while she was in pain); State v. Bass, 221 N.J.Super. 466, 483, 535 A.2d 1 (App.Div.1987), certif. denied, 110 N.J. 186, 540 A.2d 182 (1988) (statement by five-year-old eyewitness to brother's murder was "spontaneous and contemporaneous" though given in hospital six hours later); State in Interest of C.A., 201 N.J.Super. 28, 31-33, 492 A.2d 683 (App.Div.1985) (time factor may be extended for small children's utterances, but statements to mother about sex abuse not admissible where there was no indication of nervous excitement which is basis for the hearsay exception); State v. Federico, *377 198 N.J.Super. 120, 131-32, 486 A.2d 882 (App.Div.1984), aff'd, 103 N.J. 169, 510 A.2d 1147 (1986) (initial statement of victim who told police she had been kidnapped admissible when made immediately after she escaped and flagged down patrol car); Rudy v. Thompson, 186 N.J.Super. 359, 363, 452 A.2d 702 (App.Div.1982) (spontaneous statement made immediately after accident by police officer driving in back of patrol car involved in accident should be admissible in evidence); State v. Williams, supra, 106 N.J.Super. at 172-73, 254 A.2d 538 (defendant drove twelve to fifteen miles to friend's home after murder, which took about twenty minutes; statements to friend that shooting of victim was accidental found not spontaneous); Fagan v. City of Newark, 78 N.J.Super. 294, 303-05, 188 A.2d 427 (App.Div.1963) (length of time between event and utterance "is of weight but not controlling," thus fifteen minute lapse between fireman's injury and his statement that he felt ill would not render the statement inadmissible). Cf. State v. Graham, 59 N.J. 366, 370-71, 283 A.2d 321 (1971) (statements in response to interrogation are not inadmissible as excited utterance if they otherwise satisfy the rule).
Judge Triarsi reasoned:
[T]he lady indicated quite clearly that her son, 17 years of age, was very upset when he got home. WasI don't know if she used the term, hysterical, but in that vein. And this occurredthe accident the event occurred at 10 minutes to 12:00. The speech between the woman and her son is between 12:30 and 1:00. So, within an area of approximately 1 hour. We have case law which says, a half a day is okay; two hours is okay; depends upon the facts of the case.
We conclude, in light of the case law and the legal standard as applied to the present facts, that there was no misapplication of discretion in Judge Triarsi's ruling that the statement at issue was admissible as an excited utterance.
Yet even if no hearsay exception were applicable here, any error committed would have been harmless. Mrs. Cruz's visual observationsthe blood on her son's face and shirt and on the pillow the next morning, his "hysterical" conditionconstituted the most forceful part of her testimony, rather than the detail that she had heard from her son.
It is true that Judge Russell professed himself impressed with Mrs. Cruz's testimony:
[S]he also testified that [her son's] blood was coming out of his nose, streaming out of his nose. She said she was afraid to callto wake her husband up because of what he might do if he heard this incident took place.
* * * *
So, they got up the next morning, and the nose was still bleeding. She said there was blood all over his shirt.
* * * *
This comes down to a question of credibility of witnesses. Do I believe [defendant]? Do I believe Mr. Cruz? However ... [t]here is actually concrete evidence. There's direct testimony from his mother, as I said, whom I believe. This woman came in here. No way that woman was telling me anything that wasn't true.
Judge Triarsi's function on de novo review was
to determine the case completely anew on the record made in the Municipal Court, giving due, although not necessarily controlling, regard to the opportunity of the magistrate to judge the credibility of the witnesses.
[State v. Johnson, 42 N.J. 146, 157, 199 A.2d 809 (1964).]
Defense counsel argues that Judge Triarsi relied excessively on credibility findings which were tainted by the inadmissible hearsay evidence that had been allowed in, and thus he did not afford the case a proper de novo on the record review. Our review of the record discloses no indication that Judge Triarsi gave inordinate deference to Judge Russell's credibility findings. Judge Triarsi did comment with regard to the ruling below:
It's almost unprecedented in my review of these transcripts over the last eight years *378 that I have ever seen a municipal court judge quite clearly indicating on the record that he doesn't believe an officer before him testifying.
However, he added that Judge Russell's credibility findings were "sustainable on the record I have in front of me," demonstrating that he did not blindly accept those findings. Further, Judge Triarsi's exclusion of a good part of Mrs. Cruz's testimony as inadmissible hearsay indicates that he made his own appraisal of the record. The judge is quite clear as to what he gleaned from Mrs. Cruz's admissible testimony:
[T]he mother's testimony about what she saw, that is to say that her son came home hysterical, upset, and that he was bleeding, and there was blood on his shirt, and that she washed his shirt, and that the next morning there was blood on the pillow. Those things are very powerful to me.
In addition to reviewing and properly weighing Judge Russell's credibility findings as well as the admissible testimony at trial, Judge Triarsi took into account the non-testimonial evidence that had been presented: the hospital records and photographs which tended to corroborate Isadore Cruz's testimony. Ultimately, the judge stressed that his conclusions were based upon his own reading of the record:
I find [defendant], based upon my review of the record, which I've read totally, guilty of the assault. Based upon my review of the record, he did indeed use that offens[ive], coarse language.
Judge Triarsi correctly applied the Johnson de novo on the record standard of review. Although he was properly influenced to some extent by Judge Russell's credibility findings, the evidence corroborating Isadore Cruz's testimony, including the non-testimonial evidence, weighed heavily in Judge Triarsi's own evaluation. In assessing witness credibility, Judge Triarsi indicated that the hospital records in particular raised doubts about the testimony of the police officers, since the records noted a recent nosebleed. The testimony of Cruz, and of his mother, was that blood had been very much in evidence after the encounter between Cruz and defendant. Yet the police officer witnesses, including defendant, said they had not seen any blood at the scene of the encounter. Judge Triarsi remarked: "Counsel, the blood came from some place."
Defendant also highlights certain arguable discrepancies in an attempt to impugn Judge Triarsi's findings: the complaint signed by Cruz's father did not specifically mention a punch in the nose; young Cruz was inconsistent in his testimony as to whether he heard a siren before or after he entered the intersection; his testimony that the police car was driving without lights was not credible; no facial injury was apparent on the photograph taken of Cruz shortly after the encounter with defendant, though he claimed he had been punched in the nose. These objections are all collateral to the central issues in this case. Such loose threadsif the ordinary lack of symmetry that must emerge in accounts of human affairs may be so termed are hardly of sufficient importance as to lead to reversal of a determination amply supported by the record. See State v. Johnson, supra, 42 N.J. at 162-63, 199 A.2d 809.

V
Forfeiture of employment under N.J.S.A. 2C:51-2 was first mentioned by the private prosecutor of Cruz's cross-complaint on October 18, 1996, when Judge Russell announced his findings and decision. At the time, neither the private prosecutor, nor Judge Russell, nor defendant's trial counsel were aware that forfeiture was mandatory under the statute, even for commission of disorderly persons offenses. Defense counsel applied to the Acting Prosecutor of Union County, Edward M. Neafsey, for a waiver request, which was denied.
N.J.S.A. 2C:51-2a provides:
A person holding any public office, position or employment ... under the government of this State or any agency or political subdivision thereof, who is convicted of an offense shall forfeit such office or position if:
* * * *
(2) He is convicted of an offense involving or touching such office, position or employment[.] *379 There is no dispute that the offenses at issue here involved and touched upon defendant's employment as a police officer.
N.J.S.A. 2C:51-2b directs:
A court of this State shall enter an order of forfeiture ...
(1) Immediately upon a finding of guilt by the trier of fact or a plea of guilty entered in any court of this State unless the court, for good cause shown, orders a stay of such forfeiture pending a hearing on the merits at the time of sentencing[.]
Stays pending appeal are not routinely granted, however. The statute mandates:
No court shall grant a stay of an order of forfeiture pending appeal of a conviction or forfeiture order unless the court is clearly convinced that there is a substantial likelihood of success on the merits.

[N.J.S.A. 2C:51-2c.]
The forfeiture provision is strict: any person convicted of "an offense involving or touching on his public office, position or employment" is "forever disqualified" from public employment. N.J.S.A. 2C:51-2d. N.J.S.A. 2C:51-2e provides ameliorative potential, however, which defendant highlights in his remaining point on appeal.
Any forfeiture or disqualification ... which is based upon a conviction of a disorderly persons or petty disorderly persons offense may be waived by the court upon application of the county prosecutor or the Attorney General and for good cause shown.
When defense counsel petitioned Acting Prosecutor Neafsey to apply for a waiver, material was submitted both to the Acting Prosecutor and to Judge Russell, purporting to demonstrate defendant's distinguished scholastic record. He was about to graduate from Kean College and planned to enroll in a masters degree program there. Numerous commendations of defendant's character and work record, from his supervisors at work, his colleagues, and his professors at the college were also submitted. Acting Prosecutor Neafsey responded by letter to the court, indicating that he had reviewed the transcript and the material forwarded to him, and had, notwithstanding, "determined that the statutory requirement of `good cause'" did not exist. The letter specifically mentioned that defendant had not only been found guilty of assault, but that Judge Russell had also found "everything [he] said was not true."
Upon denial of the waiver request, defendant requested a hearing before Judge Russell solely on the question of forfeiture. Without responding, Judge Russell entered an order of forfeiture on December 12, 1996.
At sentencing on December 13, 1996, Judge Russell stated that once the Acting Prosecutor had declined to apply for a waiver, he, the judge, was statutorily required to execute the forfeiture provision "unless I found good cause to hold a plenary hearing." He then explained:
[T]here was no good cause. Mr. Lazarchick... without basis, assaulted a citizen, a 17-year-old boy. A year and a half later he came into this court, denied it categorically in face of overwhelming evidence.
I have ... heard nothing so far in this court which in any way indicated any contrition on the part of Mr. Lazarchick with respect to this incident.
* * * *
I could see no way that a public hearing could in any way change my mind about the lack of qualification of Mr. Lazarchick to be a police officer of the City of Elizabeth. In no way do I feel that I could permit him under these circumstances to put on a badge, put on a gun and go out into the streets of the City of Elizabeth.... and possibly do again what he did on that night. He's out of control and there's nothing that leads me to believe he wouldn't be out of control again.
On the subject of "good cause," Judge Russell elaborated on his reasoning in language which defendant, on appeal, argues was indicative of passion:
What do you think that the reputation of the Elizabeth Police Department is going to be if I would permit him to be back on the job? *380 * * * *
I have friends that live in this town. I have family that lives in this town. Supposing it had been one of my family that happened to be on that corner? Supposing it happened to be my wife? What would he have done? Got out of the car and smashed her in the face? Supposing it was somebody else's child who lived in this town.... [T]his is not some street tough. This was a kid who did absolutely nothing. He looked at a police car as coming to protect and serve. What kind of protection did that boy get? What kind of service did that boy get?
On de novo on the record review in the Law Division, Judge Triarsi opined with regard to a stay of forfeiture:
It seems quite clear to me that once the conviction is entered and there's no issue as to it being in the course of his being a police officer, the statute triggered. * * * I think there's no choice. If the Legislature and the Governor's office wanted to set up a separate area where it would not be triggered for a petty DP or DP, they would have put it into the statute.
Earlier, in words which tacitly lend support to Judge Russell's determination that good cause did not exist for a hearing, Judge Triarsi said of the statute at issue here:
Is this a harsh statute? Some people would say that. Other people would say, though, once the person violates their oath, and assaults a juvenile like this on the street, he doesn't belong to be an officer.
Defendant asserts that, under N.J.S.A. 2C:51-2e, the prosecutor's decision not to request waiver must be reviewable under an abuse of discretion standard. Otherwise, defendant argues, the unchecked power of the prosecutor would pose separation of powers problems. Underlying defendant's argument are the assumptions that a hearing at sentencing is the appropriate occasion for such review to take place and, indeed, that the forfeiture element is part of the sentence. The State counters generally, contending that defendant cannot meet the heavy burden imposed by an abuse of discretion standard, and that it was not within the legislative intent that each defendant denied a waiver application by the prosecutor be entitled to a hearing on whether "good cause" existed.
N.J.S.A. 2C:51-2e, was inserted in the statute to "ameliorate [its] harshness" in practical application. Senate Judiciary Committee, Statement to Senate Bill No. 4479 (December 17, 1987). Originally, it was proposed that municipal prosecutors be given the power to apply for waiver. Moore v. Youth Correctional Institute at Annandale, 119 N.J. 256, 267, 574 A.2d 983 (1990). This was vetoed by Governor Kean, who stressed that "only the Attorney General and the 21 county prosecutorsthe highest ranking law enforcement officers at the State and County levels, respectively," ought to possess the power to request waiver of the mandatory forfeiture of employment. Ibid. (quoting Governor Kean, Letter to the General Assembly (January 11, 1988)). The Governor attempted to clarify the purpose of the waiver provision:
[R]equiring mandatory forfeiture of and permanent disqualification from public office may, under some circumstances, be too harsh a sanction for a minor infraction of our laws. For instance, law enforcement officers are often placed in confrontational situations which may result in a complaint being filed against them for disorderly conduct, including offensive language, shoving, offensive touching, etc. While these disorderly persons offenses should be taken very seriously and dealt with sternly, they are not so serious in every case as to warrant the loss of position or the permanent, lifetime disqualification from holding such office.

[Id. at 268, 574 A.2d 983.]
We reject defendant's argument that a prosecutor's determination whether or not to apply for a waiver of forfeiture pursuant to N.J.S.A. 2C:51-2e is reviewable by the court under an ordinary abuse of discretion standard. Manifestly, forfeiture of office or employment is not an aspect of the sentence imposed for the offenses adjudicated. If it were, there would be room for an argument that ordinary abuse of discretion review is required as a separation of powers safeguard *381 against usurpation of the judicial authority to determine a sentence. See State v. Alvarez, 246 N.J.Super. 137, 144, 586 A.2d 1332 (App. Div.1991); State v. Todd, 238 N.J.Super. 445, 452-55, 570 A.2d 20 (App.Div.1990). The Supreme Court has provided insight in this regard in the context of a challenge to provisions of the Registration and Community Notification Laws of 1994 ("Megan's Law"):
[A] statute that can fairly be characterized as remedial, both in its purpose and implementing provisions, does not constitute punishment even though its remedial provisions have some inevitable deterrent impact, and even though it may indirectly and adversely affect, potentially severely, some of those subject to its provisions. Such a law does not become punitive simply because its impact, in part, may be punitive unless the only explanation for that impact is a punitive purpose: an intent to punish.
[Prohibitions against double jeopardy, bills of attainder and ex post facto laws] are towering constitutional provisions of great importance to individual dignity, freedom, and liberty. They were adopted in England and in this country to protect against real evils: to protect against the worst, and lesser, punishments, most of them obvious on their face. The search today for hidden intent is appropriate; the scrutiny of effects in order to unmask intent and purpose, even to attribute purpose, is similarly appropriate. But while the role of these constitutional provisions as protectors of individual rights must always be fully enforced, care should be exercised not to convert them into obstacles that prevent the enactment of honestly-motivated remedial legislation by subjecting laws to tests unsuited to the underlying purpose of these constitutional provisions. See, e.g., Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L. Ed.2d 644 (1963). These provisions were aimed at arbitrary and unjust actual punishment, intentionally inflicted, and their application should be guided accordingly. This does not mean that only those laws that clearly and intentionally inflict substantial punishment are to be condemned, but that the most searching inquiry is required before condemning honest laws that are free of punitive intent and designed to protect society.
* * * *
Plaintiff [registrant] asserts, correctly, that deterrence and retribution are the main characteristics of criminal sanctions and, not correctly, that any law or sanction having either of those characteristics is to that extent punitive, and the sanction, proceeding, or law, therefore constitutes "punishment" for constitutional purposes, even if only in part. The contention here is that the Registration and Notification Laws not only protect against crime but deter it: both for the potential reoffender who must register and face notification, as well as for those who might otherwise commit a first sex offense but for the potential impact of registration and notification. The second contention is that government is responsible for the potential impacts that may result from notification, whether they were intended or not, and that they may be so severe as to constitute punishment.
We ... note here that neither of those consequences invalidates a law whose sole purpose is remedial and whose provisions are designed solely to achieve that purpose; that [with rare exceptions], no case has ever held that the inevitable but unintended deterrent impact of a regulatory law by itself renders it punitive or that non-governmental reaction to that law does. We assume that if the legislative purpose was to deter sex offenders, the law would be invalid; and we have no doubt that if the government ordered punishment, the law would be invalid. Neither, however, is the case here.
[Doe v. Poritz, supra, 142 N.J. at 43-44, 662 A.2d 367.]
However significant a result, forfeiture of public office or employment is also but "a collateral consequence" of conviction. State v. Heitzman, supra, 209 N.J.Super. at 622, 508 A.2d 1161.
Forfeiture of office is a legislatively ordained mandatory requirement separate from the sentence, designed to effect an *382 important public purpose apart from punishment for an offense. According to the clear terms of the statute, the waivability determination is not reposed in the judiciary in the first instance, but rather only in the Attorney General and the county prosecutors. It is of a piece with their authority to establish policies governing the conduct of the law enforcement function, and to decide who qualifies for employment therein and when disqualification standards ought to be applied or may yield.
The waivability determination exists in a more strictured context than ordinary police employment issues which, in general, are subject to judicial review by the customary "arbitrariness, caprice or unreason" standard, including whether findings are supported by substantial evidence in the record. See, e.g., In re Vey, 135 N.J. 306, 308-09, 639 A.2d 718 (1994); Rawlings v. Police Dept. of Jersey City, 133 N.J. 182, 192-93, 627 A.2d 602 (1993); Henry v. Rahway State Prison, 81 N.J. 571, 579-80, 410 A.2d 686 (1980); Ensslin v. Township of North Bergen, 275 N.J.Super. 352, 362, 646 A.2d 452 (App.Div. 1994), certif. denied, 142 N.J. 446, 663 A.2d 1354 (1995); Bowden v. Bayside State Prison, 268 N.J.Super. 301, 304-06, 633 A.2d 577 (App.Div.1993), certif. denied, 135 N.J. 469, 640 A.2d 850 (1994); Ayars v. Department of Corrections, 251 N.J.Super. 223, 230, 597 A.2d 1084 (App.Div.1991).
By way of addressing the qualifications for holding public office or employment, the Legislature has ordained that forfeiture of office necessarily follows from "convict[ion] of an offense involving or touching such office, position, or employment," N.J.S.A. 2C:51-2a(2). Except in an instance in which the conviction is for the least grave penal wrongdoings, disorderly persons or petty disorderly persons offenses, N.J.S.A. 2C:51-2e, the question of waiving that requirement does not even arise. Also, by the plain language of the latter provision, the court may not initiate consideration of waiver; that is a function reserved to the Attorney General and the county prosecutors. Only after it has been determined that a waiver ought to be sought, does the court become involved in determining whether or not it is appropriate in the circumstances.
We are mindful, as well, of sentence-related determinations in which judicial review of prosecutorial discretion is characterized by a limited arbitrariness standard, notwithstanding the court's traditional and unrelinquishable role in sentencing. See, e.g., State v. Vasquez, 129 N.J. 189, 196, 609 A.2d 29 (1992) (prosecutor must state reasons for decision on whether to waive parole disqualification; review required as to whether exercise of discretion was arbitrary); State v. Lagares, 127 N.J. 20, 30-32, 601 A.2d 698 (1992) (enhanced sentencing section of Comprehensive Drug Reform Act must be construed to require prosecutorial guidelines, and allow for judicial review of arbitrary decisionmaking by prosecutors). See also State v. Mastapeter, 290 N.J.Super. 56, 46-65, 674 A.2d 1016 (App.Div.), certif. denied, 146 N.J. 569, 683 A.2d 1164 (1996); State v. Alvarez, 246 N.J.Super. 137, 146-47, 586 A.2d 1332 (App.Div.1991).
The decision respecting waivability of the office forfeiture provision is, however, less clearly related to traditional judicial powers such as sentencing, and more clearly akin to other governmental exercises involving law enforcement (executive branch) prerogatives, such as determining eligibility for pre-trial intervention, "a quintessential prosecutorial function," State v. Wallace, 146 N.J. 576, 582, 684 A.2d 1355 (1996), calling for enhanced deference to prosecutorial decision-making and judicial review based on a "patent and gross abuse of ... discretion" standard. State v. Leonardis (Leonardis II), 73 N.J. 360, 382, 375 A.2d 607 (1977). See also State v. Wallace, supra, 146 N.J. at 583-85, 684 A.2d 1355; Cupano v. Gluck, 133 N.J. 225, 233-35, 627 A.2d 624 (1993) (The "heightened standard of review [of a prosecutor's decision to prosecute] cautions our hesitancy in brooking any more than a minimal intrusion into the area of prosecutorial discretion."); State v. DiFrisco, 118 N.J. 253, 265-66, 571 A.2d 914 (1990) (With regard to a prosecutor's "wide discretion to charge or not to charge persons suspected of criminal offenses * * * * this Court has asserted a minimal but significant role in the review of *383 [its] exercise.") By application of the appropriate "enhanced deference" standard of review, the trial court was clearly correct in declining to review the Acting Prosecutor's decision not to seek a waiver of forfeiture.
This is not to say that the prosecutor's decision in this case to forego applying for waiver of forfeiture would not survive ordinary abuse of discretion review. Both Judge Russell and Judge Triarsi plainly indicated that they considered defendant, because of the nature of his conduct towards an unarmed and unthreatening civilian, "out of control," and consequently not temperamentally suited for police work. There is substantial evidence in the record to justify that conclusion. The trial court's refusal to entertain defendant's application for a plenary review of the prosecutor's determination not to apply for a waiver of the statutory forfeiture requirement, i.e., the court's refusal to find "good cause" for a hearing on the appropriateness of forfeiture, to the extent within its powers at all, was well warranted.
The judgment of conviction and attendant rulings are affirmed.
NOTES
[1] Judge King was not present at oral argument but, with the parties' consent, he has continued to participate in the appeal with the benefit of a tape recording.
[2] It is a discretionary decision governed by the Code of Judicial Conduct, particularly Canons 2 and 3, Rules Governing the Courts of the State of New Jersey, Appendix to Part I, pp. 391-400 (1997), and subject to the mechanics established in N.J.S.A. 2B:12-6 and -16b, R. 1:12-3(a), and R. 7:4-3(b).