## COMMONWEALTH vs. IVAN A. DiMONTE.

Suffolk. February 5, 1998. - April 10, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Assault and Battery. Evidence,* Hearsay, Spontaneous utterance, Hospital record, Admissions and confessions, Relevancy and materiality. *Practice, Criminal,* Admissions and confessions.

Discussion of the spontaneous exclamation exception to the hearsay rule and cases considering whether a writing may qualify as an excited utterance. [237-240]

A facsimile transmission sent by a victim at least eight and one-half hours and as long as eleven hours after a presumed assault occurred did not, in the circumstances, have the indicia of reliability required for its admission in evidence for its truth under the spontaneous exclamation exception to the rule against hearsay [240]; and certain statements made some time thereafter to a police officer also lacked such indicia and were not so admissible [241].

Statements of an injured victim in hospital records were not properly admissible as excited utterances where they were made more than ten hours after the alleged assault [241-242], and unqualified statements in the records reporting the ultimate conclusion of the crime charged — assault and battery — should have been redacted [242].

At the trial of a complaint for assault and battery, the judge did not err in admitting in evidence an admission of the defendant made some six weeks before the alleged incident that was probative of the defendant's motive to assault his spouse. [243-244]

COMPLAINT received and sworn to in the Boston Municipal Court Department on April 19, 1995.

The case was tried before *Linda Giles*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*William G. Small (Charles W. Anderson, Jr.,* with him) for the defendant.

*Maryanne E. Kilty*, Assistant District Attorney, for the Commonwealth.

MARSHALL, J. On July 21, 1995, a jury in the Boston Municipal Court returned a guilty verdict of assault and battery, G. L. c. 265, § 13A, against the defendant, Ivan A. DiMonte

(husband).[1] The complainant, DiMonte's wife[2] (wife), did not testify at trial. The defendant appeals from his conviction based on claimed errors in the admission in evidence of several extrajudicial statements by the wife and by the defendant. We agree that the judge erred in admitting some testimony that was hearsay. The hearsay evidence may well have contributed to the jury's verdict. We therefore reverse the judgment of the Boston Municipal Court and set aside the verdict.

1. The jury could have found the following facts. On April 18, 1995, Rabbi Michael Luckens telephoned the wife regarding selections for her planned singing performance honoring a Japanese diplomat who had helped to save many Jews during the Holocaust.[3] Luckens estimated that he telephoned between noon and 1 P.M., although he conceded that it may have been as early as 10:30 A.M. During the conversation Luckens heard in the background a man, whom the wife identified to Luckens as her husband, arguing with and then screaming at her. Luckens then heard a "blood curdling" scream from the wife, after which the telephone was hung up. After calling back several times and reaching only the answering machine, Luckens called 911, and was referred to and then spoke with the Boston police department. There is no evidence concerning what, if any, action the police took at that time.

Later that evening, at 9:23 P.M., Yuson Hasegawa-Johnson, an acquaintance of the wife, received a facsimile transmission from the wife, written in Japanese.[4] Hasegawa-Johnson took the facsimile to the Boston police, and accompanied by a friend, Michael Thompson, went with the police to the apartment where

---

[1]Not guilty verdicts were returned on two other counts, assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A, and making criminal threats, G. L. c. 275, § 2.

[2]To protect the privacy of the wife, who has a name different from her husband, we will not refer to her by name.

[3]The wife was planning to perform at two concerts, one on April 23 at the Massachusetts Institute of Technology and the other on April 28 at the annual Holocaust memorial program at Rabbi Luckens's synagogue.

[4]The native language of both the wife and Hasegawa-Johnson is Japanese. A written English translation of the facsimile was not introduced at trial. The judge allowed Hasegawa-Johnson to translate the facsimile orally, once during a voir dire and again for the jury. Our review of Hasegawa-Johnson's testimony on both occasions suggests that Hasegawa-Johnson's attempted translation reflected multiple levels of ambiguity. Some of that ambiguity apparently inhered in the wife's thoughts, words, and script and was contained within the untranslated text of the facsimile. Hasegawa-Johnson tried to convey that ambiguity with accuracy. Some of the ambiguity inhered in the

the wife lived with her husband. The police forced entry into the apartment after the defendant refused to open the door. The wife was found in a bedroom, holding her son. Her face was bloodied, she had facial cuts and bruises, and her left eye was swollen shut. She told police that the defendant had struck her in the face with some furniture. The police then arrested the defendant. It was later determined that the wife's orbital bone was fractured. Hasegawa-Johnson and Thompson accompanied the wife to a hospital. They both testified about the wife's injuries that they had observed. Thompson also testified that some six weeks prior to the incident, the defendant had said that he was jealous of his wife, and that "once he had spent a day and an evening outside a building in the rain watching for her."

On the day the trial commenced, the defendant filed a motion to suppress the wife's statements in the facsimile and her oral statements to Hasegawa-Johnson and to a police officer. Treating the motion to suppress as a motion in limine, the judge conducted a voir dire of Hasegawa-Johnson before ruling the facsimile admissible.[5] The defendant also filed a motion in limine to exclude from evidence, inter alia, Thompson's state-

---

translation from Japanese to English and in Hasegawa-Johnson's nonnative, imprecise English usage. Some of Hasegawa-Johnson's testimony is confusing because she did not always distinguish between her direct translation and her indirect glosses and interpretations she derived from reading the facsimile.

At trial, Hasegawa-Johnson gave the following translation of the facsimile, as best we can interpret her testimony:

"Yu. Igor tried to kill me. My face beaten swollen so hard that I can't open my left eye. He's threatening me if I call police. He's threatening me if I tell me. He's threatening me if I sing at the concert. I became unable to sing on the 23rd. But please, please, please make the concert successful. Right now it's so dangerous. Don't let anyone call me, even you. But I will, I will remember, I will never remember this humiliation, will definitely kill. . . . Somebody from embassy called . . . during the message, Igor said fuck and hung up. Call the embassy, ask who's coming. . . . Call, get contract from Killian Hall. Fax flyer. . . . Call all the participants. Tell them to come to the concert . . . . By 2:15 p.m. . . . Get key from the concert hall on Friday. . . . [I]nstead of me, Rosalie Gerard can sing Jewish song. . . . Call Ted. [Telephone number.]"

[5]At the hearing on the motion in limine, after considering the arguments of counsel and such relevant case law as counsel suggested illuminated this novel (in Massachusetts) evidentiary question, the judge issued a "partial ruling," informing counsel that she would not exclude a translation of the facsimile either because it was transmitted nine to ten hours after the incident,

ment as to DiMonte's jealousy. During the trial the Commonwealth introduced, over the defendant's objection, the wife's medical records of her emergency room visit.

2. For the second time this term, we are asked to decide how facsimile transmissions fit within preexisting law. See *Commonwealth* v. *Richards*, 426 Mass. 689 (1998) (discussing whether a facsimile transmission is a telephone call). The defendant asks whether a facsimile transmission ever can be considered a spontaneous exclamation, qualifying as an exception to the hearsay rule. We have never addressed the question. We decline to establish a categorical rule, as we can envision rare circumstances in which a writing, whether in the form of a facsimile transmission or otherwise, could be considered a spontaneous exclamation made when a person is in an excited or agitated state. In the case of the facsimile transmission sent by the wife, however, we agree with the defendant that it lacks adequate indicia of reliability to qualify as a hearsay exception.

"Under the spontaneous exclamation exception to the hearsay rule, 'a statement is admissible if its utterance was spontaneous to a degree which reasonably negated premeditation or possible fabrication and if it tended to qualify, characterize and explain the underlying event' . . . . The statements ' "need not be strictly contemporaneous with the exciting cause" ' . . . . In determining whether an utterance meets the tests of admissibility, the trial judge 'ought to be given broad discretion. . . . [A]nd only in clear cases . . . of an improper exercise of discretion should [her] ruling be revised.' " (Citations omitted.) *Commonwealth* v. *Crawford*, 417 Mass. 358, 362 (1994). See Proposed Mass. R. Evid. 803 (2). In this case, the judge was faced with particularly difficult circumstances in reaching her decision: the message was written in a foreign language; the Commonwealth and the defendant could not agree on an accurate written translation of the facsimile; the Commonwealth did not offer in evidence a written translation of the facsimile transmission or the testimony of an independent translator; and the witness who did translate the facsimile orally was the wife's friend who admitted she could be biased against the defendant.

---

or because the statement was long, as the defendant had argued. She then heard testimony from Hasegawa-Johnson, and thereafter concluded that the facsimile was an excited utterance, admissible as an hearsay exception.

Moreover, there is no precedent in this Commonwealth on which the judge could rely, and there is little precedent from other jurisdictions that was of assistance to her. In reaching a decision different from hers, we note the exceptionally careful way in which the judge considered this issue and balanced the competing interests at stake.

We take up first those objections to the admission of the facsimile transmission that are unique to it as a writing, rather than as a spoken communication.[6] The defendant argues that the acts of drafting and transmitting a facsimile message deprive it of the spontaneity required by the hearsay exception for spontaneous exclamations. Writing, he contends, is an inherently premeditated process; manipulation of a facsimile machine, once a message is written, is an additional deliberated sequence of actions. He further argues that the recipient of a written message has no percipient experience of the sender at the moment when she writes and sends the message, and cannot testify to the sender's demeanor, tone of voice, or degree of observed excitement or stress. The arguments are persuasive.

In admitting the facsimile transmission as an excited utterance, the judge based her decision in part on "the style used, the handwriting." This conclusion was based on Hasegawa-Johnson's testimony at voir dire. Hasegawa-Johnson claimed familiarity with the wife's handwriting primarily from her frequent facsimile transmissions to Hasegawa-Johnson, including three other transmissions sent earlier on that same day, but apparently before the conflict with the defendant arose. Hasegawa-Johnson characterized the wife's writing as usually neat, but said that the facsimile transmission at issue was different: "[i]t's like all the flying [*sic*] . . . like she, without really thinking carefully what to write, she just wrote what she thought

---

[6]The defendant claims that Hasegawa-Johnson was unqualified to act as a translator of the facsimile transmission, that the translation was infected in any event with Hasegawa-Johnson's alleged bias, and that consequently her translation was unclear and inaccurate. The defendant did not raise these objections at either the voir dire hearing or the trial, nor did he object to the witness's opinion testimony concerning the wife's writing style. Because these issues were not raised below, we need not consider them here. *Commonwealth* v. *Garçia*, 409 Mass. 675, 678-679 (1991), and cases cited. We need not reach them, in any event, because we conclude that the facsimile transmission was not admissible on other grounds.

was important to tell me."[7] While such observations of handwriting style may be entitled to some weight in assessing the spontaneity of the facsimile statement, handwriting style may vary due to a number of different circumstances, not only due to the excitement of an underlying stressful event. Here the conclusions concerning the wife's handwriting style depend wholly on the nonexpert opinion of Hasegawa-Johnson, a witness who could be viewed as harboring bias against the defendant. Moreover, our review of Hasegawa-Johnson's testimony indicates that, despite her clear attempt to assist the court, her expressions in English confuse exactly how she meant to characterize the wife's script. We are dubious that such evidence supplies an equivalent degree of reliability as that which would be available from someone testifying to a spoken excited utterance.

On our request during oral argument for authority for the proposition that a writing could qualify as an excited utterance, the Commonwealth brought to our attention only three cases that have addressed the issue. See *State* v. *Boppre*, 234 Neb. 922 (1990); *State* v. *Justice*, 92 Ohio App. 3d 740 (1994); *State* v. *Dixon*, 37 Wash. App. 867 (1984). Of these, only in *Boppre* was a writing found to meet the requirements for the spontaneous exclamation exception to the hearsay rule. *Boppre, supra* at 950. In that case, a murder victim had scrawled the abbreviated name of his assailant in blood and grease on the floor in the estimated five- to ten-minute interval before he expired of gunshot wounds, a writing that also qualified as a dying declaration exception to hearsay. *Id.* at 929-930.[8] Courts in the other two cases held inadmissible written statements by victims given at police stations shortly after being assaulted, while affirming the admission of the victims' oral statements to police as excited utterances. *Justice, supra* at 747 (harmless error). *Dixon, supra* at 874 (same).

*Boppre* provides one example when a writing may be admis-

---

[7]Other aspects of the writing highlighted by Hasegawa-Johnson as distinct from the wife's normal writing included incoherent or illegible characters, writing squeezed on to one page that normally would be transmitted on two pages, and characters written up the side of the page. Hasegawa-Johnson also compared the writing to one other facsimile previously sent by the wife when she was in a hurry.

[8]The "writing" was depicted in a photograph, and was admitted as a dying declaration exception to hearsay. *State* v. *Boppre*, 234 Neb. 922, 949-950 (1990). Neb. Rev. Stat. § 27-804(2)(b) (1989).

sible as a spontaneous exclamation. Other occasions may be when a victim is held hostage and is unable to communicate in any way other than writing[9] or when a person's vocalization is impaired, as the judge here observed. Because a writing is more suspect as a spontaneous exclamation than is an oral statement, the circumstances of the writing would have to include indicia of reliability even more persuasive than those required for an oral statement before we could conclude that the writing qualified as a spontaneous exclamation. We therefore look for such heightened indicia in the circumstances of the wife's writing, but find none. Rather, the defendant points out two other circumstances undercutting the admissibility of the wife's facsimile message: it was sent at least eight and one-half hours and perhaps as long as eleven hours after Rabbi Luckens heard the wife scream, the presumed time that the assault occurred. In addition, a part of the facsimile has to do with making alternate arrangements for a concert, thus implying the wife's reflection and deliberation in composing the statement.

To qualify as a spontaneous exclamation, a statement must be made "under the influence of an exciting event and before the declarant has had time to contrive or fabricate the remark, and thus it has sufficient indicia of reliability." *Commonwealth* v. *Zagranski*, 408 Mass. 278, 285 (1990). "[T]here can be no definite and fixed limit of time. Each case must depend upon its own circumstances." *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 223 (1973), quoting 6 J. Wigmore, Evidence § 1750 (3d ed. 1940). But the length of time between the incident and the statement is important; the further the statement from the event, the more difficult it becomes to determine whether the statement is the result of reflection, influenced by other factors. See McCormick, Evidence § 272, at 218 (4th ed. 1992). We have affirmed admitting as spontaneous exclamations a victim's statements made within minutes after an assault occurred. See, e.g., *Commonwealth* v. *Fuller*, 399 Mass. 678, 682 (1987); *Commonwealth* v. *Sellon*, 380 Mass. 220, 229 (1980). Our affirmance of a judge's admission of a statement to a physician from a

---

[9]We do not ignore that battered women in some cases effectively may be held hostage by their batterers. In its brief the Commonwealth argues that the wife had been "locked in her room" and "deprived of any assistance" until the arrival of the police many hours after the beating and that the wife was "imprisoned" in her apartment. The evidence is insufficient to establish this claim.

child some five hours after she had been scalded is an outer limit of time in our cases thus far. *Commonwealth* v. *Brown*, 413 Mass. 693, 695-696 (1992). See *Commonwealth* v. *Crawford*, 417 Mass. 358, 360-363 (1994) (child's statement concerning her mother's murder by child's father, made up to five hours after homicide, but at "the first safe opportunity," qualified as spontaneous exclamation). In *Brown*, we also noted cases from other jurisdictions that had approved admissibility of statements as spontaneous exclamations made after longer intervals of time. *Brown*, *supra* at 696, citing *Guthrie* v. *United States*, 207 F.2d 19, 23 (D.C. Cir. 1953) (statement eleven hours after assault); *State* v. *Starcevich*, 139 Ariz. 378, 387-388 (Ct. App. 1983) (statement about nine hours after rape); *People* v. *Nevitt*, 135 Ill. 2d 423, 443-446 (1990) (statement about five hours after assault); *State* v. *Crowhurst*, 470 A.2d 1138, 1145 & n.4 (R.I. 1984) (statement about three hours after event).

Bearing in mind these cases as well, the interval of time between the incident injuring the wife and the transmission of the facsimile message is at an outer limit for qualifying the facsimile message statement as a spontaneous exclamation. In admitting the facsimile as a spontaneous exclamation, the judge found that "the stressful, traumatic condition continued up to and including and through the time that the police and this witness arrived."[10] While there may be circumstances in which such stress continues over a long interval of time after the triggering exciting event, the circumstances in this case are insufficient to provide the requisite basis for admissibility. Here, a significant part of the wife's facsimile statement instructs Hasegawa-Johnson to make alternative arrangements for one or both concerts. This aspect of the facsimile transmission suggests a premeditated message, not a spontaneous exclamation. For these multiple reasons we conclude, on balance, that the facsimile transmission in this case lacks the indicia of reliability that are required before admitting an extrajudicial statement for its truth, as a spontaneous reaction to an exciting event. The motion to exclude the facsimile should have been allowed.

---

[10]*Nemeth* v. *Ford Motor Co.*, 61 Mich. App. 359 (1975), is the only other case we have found where a writing, in that case a statement of a percipient witness to an automobile accident, was offered as a spontaneous exclamation hearsay exception. The Michigan Court of Appeals reversed a decision of a judge who "did not determine whether the declarant ever was or continued to be excited or upset," or whether "the event was of a continuing nature, causing a continuing excitement." *Id.* at 363.

The defendant also moved to suppress statements that the wife made to an officer after the police arrived at the apartment at 11 P.M. and subsequently to Hasegawa-Johnson at the hospital. The judge denied the motion based on her finding that the stressful, traumatic condition continued through those points in time. Over continuing objection, the officer testified that the wife stated that she was struck by the defendant "with some furniture of some sort." Hasegawa-Johnson testified that later, at the hospital, where records indicated the "time in admission" to be 12:44 A.M., the wife told Hasegawa-Johnson that the defendant beat her and threw an object or objects at her. By the time the wife made these statements, even more time had elapsed. Because of the extended interval of time between the exciting event and these statements, they too lack the reliability implicit in a spontaneous exclamation and also should not have been admitted.[11]

3. The defendant also objected to certain statements included in hospital records from the night that the wife received treatment for her injuries. The hospital intake form reported in part "CC 'assaulted' "; "being assaulted"; "Pt struck in the face [with] fist"; "she reports having a plastic container thrown [at] her which struck her [right] forehead"; and "Diagnosis: 1) Assault." Another report form twice states that the wife was "assaulted." Finally, the triage report notes "p. assault to face [with] closed fist"; and "was kicked to [right] lat thigh." The judge ruled against the defendant and allowed the Commonwealth to introduce the unredacted records, based on both the spontaneous exclamation exception and the medical records exception to the hearsay rule. See G. L. c. 233, § 79.[12]

The spontaneous exclamation exception to hearsay does not

---

[11]We observe that there are differences between the wife's descriptions of the assault contained in the facsimile transmission, in her statements to the police, and in her statements contained in the medical records. While she stated consistently that she had been assaulted by the defendant, the descriptions of the assault vary. It is possible that after the forced entry by police into the apartment and in the subsequent disturbance, the wife may have made statements to the police under the influence of the exciting event of their arrival. The Commonwealth never argued the point, and on this record we are unable to determine whether her statement to the police was unpremeditated for that reason.

[12]General Laws c. 233, § 79, provides in pertinent part: "Records kept by hospitals . . . shall be admissible . . . as evidence in the courts of the commonwealth so far as such records relate to the treatment and medical history

cover the statements included in the medical records for the same reason that we determined that the wife's other oral statements did not qualify as spontaneous exclamations. Even more time had lapsed before the wife reached the hospital, and she had been in the presence of her friends, according to whom she seemed relieved, particularly when she was at the hospital. There is little to suggest that her statements at the hospital were spontaneous or made under the stress needed to qualify as an excited utterance. See *Commonwealth* v. *Burnett*, 417 Mass. 740, 744 (1994).

As for the medical records exception, "[o]ur decisions have demonstrated liberal interpretation of the statute in the admission of hospital records." *Commonwealth* v. *Concepcion*, 362 Mass. 653, 655 (1972), quoting *Commonwealth* v. *Franks*, 359 Mass. 577, 579 (1971). We have said that "a record which relates directly and mainly to the treatment and medical history of the patient, should be admitted, even though incidentally the facts recorded may have some bearing on the question of liability." *Concepcion*, *supra* at 656, quoting *Cowan* v. *McDonnell*, 330 Mass. 148, 149 (1953). In a considered survey of our precedents regarding the medical records exception to hearsay, the Appeals Court distinguished a "conclusory fact central to the jury's inquiry" from "physical observations from which inculpatory inferences flow" and noted that "[a]n unqualified statement, enhanced with a cloak of professional and institutional authority, that the very crime which the prosecution is bound to prove has occurred, acquires considerable potency." *Commonwealth* v. *Baldwin*, 24 Mass. App. Ct. 200, 202 (1987). The court in *Baldwin* then reversed a ruling admitting a medical record stating a "diagnosis" of "sexual molestation." *Id.* at 202, 203.

The Commonwealth concedes that the unqualified statements in the wife's hospital records that report the ultimate conclusion of the crime charged — an assault and battery — should have been redacted from the hospital records before they were introduced as exhibits. The more fact-specific references to the reported cause of the wife's injuries are part of her medical history and are relevant to treatment. While these references are incidental to liability, we conclude that it was not error to admit those statements and other parts of her medical record.

of such cases . . . but nothing therein contained shall be admissible as evidence which has reference to the question of liability."

4. The defendant's last issue is the admission of Thompson's testimony of a conversation with the defendant over dinner some six weeks before the April 18, 1995, incident.[13] The defendant claims the testimony was irrelevant and immaterial to any issue in the case and was prejudicial. The defendant also claimed that there was no evidence in Thompson's testimony or otherwise as to when the underlying action referred to in Di-Monte's story occurred. The judge admitted the testimony to show the course of conduct between the defendant and the wife, and to show the defendant's motive and state of mind.

A party's admission is excluded by definition from the hearsay rule. Proposed Mass. R. Evid. 801 (d) (2). "An admission in a criminal case is a statement by the accused, direct or implied, of facts pertinent to the issue, which although insufficient in itself to warrant a conviction tends in connection with proof of other facts to establish his guilt." *Commonwealth* v. *Lewin (No. 2)*, 407 Mass. 629, 631 (1990), quoting *Commonwealth* v. *Bonomi*, 335 Mass. 327, 347 (1957). The issue of Thompson's testimony concerning the defendant's statement is therefore whether it is probative of an element of the offense charged and, if so, whether its probative value is substantially outweighed by the danger of prejudice. Proposed Mass. R. Evid. 401, 403.

To convict on an assault and battery charge, the Commonwealth must show the defendant's intent to commit the assault and battery. Evidence of a hostile relationship between spouses is probative of a defendant's motive in an act of violence against his spouse. *Commonwealth* v. *Gil*, 393 Mass. 204, 215 (1984). See *Commonwealth* v. *Robertson*, 408 Mass. 747, 751 (1990). The defendant's argument that the time frame of the incident may make it too remote is also a question of relevance. *DeJesus* v. *Yogel*, 404 Mass. 44, 47 n.3 (1989). Before ruling on the motion in limine, the judge confirmed with the prosecutor when the dinner conversation between the defendant and Thompson had taken place. Implicit in the judge's ruling was that the time frame of the incident was not as important as whether the conversation itself had occurred recently enough to reflect the defendant's state of mind. A

---

[13]Thompson testified that "[DiMonte's] story concerning the jealousy was one that he prefaced . . . by saying . . . he has such a young wife, married to this old, ugly man and he was jealous and that, so much so that, once he had spent a day and an evening outside a building in the rain watching for her."

judge's decision that evidence is relevant and that the probative value of relevant evidence is not outweighed by its prejudicial effect will be upheld on appeal absent palpable error. *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990). We conclude that the judge did not commit error in admitting Thompson's testimony.

The charges against the defendant are serious. As often occurs in cases of domestic violence, the victim of the abuse did not testify. As a result, the Commonwealth was confronted with a considerable challenge in proving the charges. In this case the wife was fortunate that friends sought to assist her, and could describe to the jury what they observed. The jury clearly rejected the defendant's strained account of the incident that occurred on April 18. It was error for the judge to admit the hearsay evidence, notwithstanding her careful exploration of the circumstances surrounding the hearsay statements, and the prosecutor's professional and even-handed proffer of those statements. The admission of hearsay was prejudicial error; it may well have contributed to the jury's verdict. *Commonwealth* v. *Perrot*, 407 Mass. 539, 548-549 (1990). The judgment of the Boston Municipal Court is reversed and the verdict is set aside.

*So ordered.*