COMMONWEALTH *vs.* ANDRES PIEROWSKI.[1]

No. 00-P-844.

Essex. February 11, 2002. - May 10, 2002.

Present: MASON, COHEN, & MILLS, JJ.

*Evidence,* Spontaneous utterance.

At the trial of a complaint charging the defendant with assault and battery by means of a dangerous weapon, the judge erred in allowing the Commonwealth's motion in limine to admit the victim's nod of the head, in response to repeated questioning by a police officer, as a spontaneous utterance, where the victim's head nod was not made under the influence of an exciting event, but was elicited by the persistent questioning of the officer after the victim had unambiguously attempted to avoid the attention given to her; where the head nod was the sole evidence of the charge against the defendant, its admission was prejudicial and required reversal of the defendant's conviction. [709-712]

COMPLAINT received and sworn to in the Lawrence Division of the District Court Department on February 22, 1999.

The case was tried before *Ellen Flatley,* J.

*Geoffrey DuBosque* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

MILLS, J. A jury of six in District Court convicted the defendant of assault and battery by means of a dangerous weapon, to wit, a knife. G. L. c. 265, § 15A. The victim was Olga Pierowski, the defendant's wife. The sole issue on appeal is whether Officer Daniel Fitzpatrick should have been permitted to testify, over objection, to a "statement" made by Olga under the rubric of "spontaneous utterance," an exception to

---

[1]As is our custom, we spell the defendant's name as it appears in the criminal complaint filed in the District Court.

the rule against hearsay evidence.[2] After voir dire, the judge allowed, without comment, the Commonwealth's motion in limine to admit Olga's nod of the head as a statement. We reverse.

During voir dire, Fitzpatrick testified to the following. On February 19, 1999, at approximately 7:00 P.M., he and other officers were dispatched to a second floor apartment at 22 Smith Street in Lawrence.[3] When he arrived he observed blood splattered on the floor and on a table in the kitchen. Other than the police officers, Olga and the defendant were the only persons present in the apartment.

Fitzpatrick testified that Olga was "visibly upset." She was speaking Polish and would not stand still. He noticed blood on her leg and that her "crying was constant." An ambulance was called to take her to the hospital, and although Olga was reluctant to go and sought to avoid attention from anyone in the apartment, including the medical attendants at the scene, she was eventually convinced to leave with them. Fitzpatrick followed the ambulance to the hospital and waited outside her room for ten or fifteen minutes before he went inside to question her. Approximately forty-five minutes had elapsed between the initial radio transmission and the time he went into her room at the hospital.[4] When Fitzpatrick entered the hospital room, Olga "started crying again," and he observed that she was "very upset, crying and shaking." He also "noticed the odor of liquor coming from her breath" and that her eyes were "very red." His subsequent questioning of her lasted approximately forty-five minutes.

During the questioning, Fitzpatrick and Olga were alone. Fitzpatrick described the session:

---

[2]Olga was the sole defense witness at trial, and her testimony largely supported the defense theory that the wounds she received from the knife were accidental.

[3]At trial, Fitzpatrick testified that the officers were dispatched in response to reports of a fight.

[4]Generally, Fitzpatrick's trial testimony tracked his voir dire testimony. There were minor discrepancies concerning the lapse of time between the initial radio call and the hospital interview. The medical records introduced at trial recite that Olga arrived at the hospital at 7:30 P.M., which was one-half hour after the officers' arrival at the apartment. Officer Padellaro testified that the officers spent only one-half hour in the apartment.

"[L]ike I said, she speaks very little English, so I had to keep asking her questions, the same *question* over and over. I don't know if I said exactly what happened in the apartment, but she began to tell me a story [about] what had happened, not that day but a day — a few days prior to that. . . . She was very upset, crying and shaking." (Emphasis added.)

Because of the language barrier "the whole questioning period took quite a while." The "story" concerned her husband killing and burying a deformed kitten, but Fitzpatrick was unclear from her story as to when the incident actually took place.[5] He repeatedly mentioned the "communications barrier," and that he "really couldn't get that [story] . . . clear from her." He then asked her if the incident with the kitten was "the reason why [the defendant] stabbed you." At that point he observed Olga nodding her head "up and down."[6]

On cross-examination, Fitzpatrick again acknowledged that Olga's "English was very poor" and commented that, although Olga had a hard time understanding him, he did not have a hard time understanding her.

*Discussion.* A spontaneous exclamation, spontaneous utterance, or excited utterance, as an exception to the hearsay prohibition, allows an extrajudicial declaration to be admitted in evidence if its reliability can be established within the rubric of the exception that pertinent authorities have repeatedly stated. See *Rocco* v. *Boston-Leader, Inc.*, 340 Mass. 195, 196-197 (1960); *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 221-223 (1973); *Commonwealth* v. *King*, 436 Mass. 252, 254-255 (2002); *Commonwealth* v. *Hardy*, 47 Mass. App. Ct. 679, 682 (1999).

Cases subsequent to *Rocco* v. *Boston-Leader, Inc.*, *supra*, and *Commonwealth* v. *McLaughlin*, *supra*, have provided ancillary guidance. A declaration may be in the form of answers to specific questions. See *Commonwealth* v. *Fuller*, 399 Mass. 678, 682-683 (1987); *Commonwealth* v. *Grant*, 418 Mass. 76, 82 (1994). In *Grant*, the statements were made in response to

---

[5]Other than her recitation of the deformed kitten story, it appears that Olga primarily answered Fitzpatrick's questions with "yes" and "no" responses.

[6]It does not appear that Olga made any oral response in conjunction with the head nod, nor does it appear that she was asked for one.

questioning while the declarant was hysterical and being treated by emergency medical technicians. The statements were deemed admissible because of their inherent trustworthiness. *Ibid.* In *Fuller*, the declarant's statements were also made in response to specific questioning. In that case the declarant child's answers went beyond a simple "yes" or "no" and she did not merely "adopt the facts in the question." 399 Mass. at 682. The issue, therefore, is not whether the statement was made without the prompting of a question, but "whether reasonable 'indicia of reliability' support the statement's admissibility." *Id.* at 683.

In considering whether a writing, i.e., a facsimile transmission, can be admitted as a spontaneous utterance, the court in *Commonwealth* v. *DiMonte*, 427 Mass. 233, 239 (1998), held that, "[b]ecause a writing is more suspect as a spontaneous exclamation than is an oral statement, the circumstances of the writing would have to include indicia of reliability even more persuasive than those required for an oral statement." The parties have cited no other cases from the Commonwealth or other jurisdictions that have considered nonverbal statements as spontaneous utterances.

Other circumstances evaluated include whether the statement was volunteered by the declarant, *Commonwealth* v. *Crawford*, 417 Mass. 358, 361-364 (1994) (child volunteered information, not suggested by adult questioner); the length of time between the incident and the statement, and whether the statement was "influenced by other factors," *Commonwealth* v. *DiMonte, supra* at 239; see McCormick, Evidence § 272, at 218 (4th ed. 1992); whether the statement was made at the place of the exciting incident or at another place, *Commonwealth* v. *Zagranski*, 408 Mass. 278, 284-286 (1990) (statements made by wife in kitchen immediately after husband arrested for murder); or whether the statement was made during a "rapidly developing incident," *Commonwealth* v. *Clary*, 388 Mass. 583, 589 (1983).

In this case the extrajudicial declaration was introduced as the officer's observation of Olga's "up and down" head nod, without oral comment, interpreted by him as an affirmative

answer to his question.[7] Chronologically, the nod occurred toward the end of forty-five minutes of questioning, in which the only narrative by the declarant was the deformed kitten story, an event occurring one or more days prior to the stabbing incident. There was also a serious language barrier between Olga and the questioning officer. We conclude that Olga's "statement," in these circumstances, was not made under the influence of an exciting event, and thus does not meet a foundational requirement of the exception.[8] The head nod was not "made under the immediate and uncontrolled domination of [her] senses," *Commonwealth* v. *Hardy*, 47 Mass. App. Ct. 679, 683 n.5 (1999), but was elicited by the persistent questioning of the police officer, after Olga had unambiguously attempted to avoid the attention given to her.

We are mindful that the charge against the defendant is serious and that, often in domestic violence cases, the person believed to be a victim of abuse either does not testify or, as in this case, testifies contrary to expectations. See *Commonwealth* v. *King*, *supra* at 254, where the declarant narrated her story to two different police officers, prepared a consistent affidavit shortly thereafter, and then contradicted those statements in her trial testimony. In such cases, "the Commonwealth [is] confronted with a considerable challenge in proving the [case]." *Commonwealth* v. *DiMonte*, *supra* at 244. We also recognize that the trial judge has broad discretion in these circumstances, *Commonwealth* v. *Zagranski*, 408 Mass. at 285, and that in this particular case, the trial judge had little or no precedent to guide her. See *Commonwealth* v. *DiMonte*, 427 Mass. at 237.

On balance, however, we conclude that Olga's nod of the head, in response to repeated questioning by a police officer, did not qualify as a spontaneous utterance. The error was prejudicial

[7] The declarant must intend that her nonverbal conduct be an assertion. See Liacos, Massachusetts Evidence § 8.1, at 463 (6th ed. 1999). In *Commonwealth* v. *Marrero*, 436 Mass. 488, 496 (2002), the court described a nodding head as "communicative in nature . . . constitut[ing] admissions by deliberate nonverbal expression." However, the head nods in *Marrero* were not in the context of spontaneous utterance and there was no evidence of any language barrier between the questioner and the witness.

[8] We can visualize circumstances in which a nonverbal communication can be considered a spontaneous utterance, but we leave that discussion to another day.

because Olga's head nod was essentially the sole evidence of the charge against the defendant, and was forcefully argued by the prosecutor in his closing.[9] Accordingly, we reverse the judgment and set aside the verdict.

*So ordered.*

---

[9]The Commonwealth, while acknowledging that Fitzpatrick's testimony of his "conversation" with the victim was pivotal to its theory that the stabbing was deliberate and not accidental, argues that any error was obviated because Olga testified for the defense, recanted portions of her statement to Fitzpatrick, and was effectively "cross-examined" by the defense regarding the statement. We disagree. Compare *Commonwealth* v. *Whelton*, 428 Mass. 24, 27 (1998). The prejudice to the defendant was not eradicated.