811 A.2d 491 (2002)
356 N.J. Super. 54
STATE of New Jersey, Plaintiff-Respondent,
v.
Anthony CONIGLIARO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 30, 2002.
Decided December 17, 2002.
*492 Clifford E. Lazzaro & Associates, Newark, attorneys for appellant (Heather A. Fierro, on the brief).
David Samson, Attorney General, attorney for respondent (Michael LoGalbo, Deputy Attorney General, of counsel and on the brief).
Before Judges KESTIN, EICHEN and WEISSBARD.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
In this case we address an issue not previously resolved in our reported jurisprudence; whether a statement written out by the victim at the request of the police at the police station several hours after the crime qualifies as an excited utterance under N.J.R.E. 803(c)(2). We conclude that such a written statement does not ordinarily come within this hearsay exception and that the admission of such a statement in this case constituted error which was not harmless. Accordingly, we reverse and remand for a new trial.
Defendant, Anthony Conigliaro, was charged with criminal sexual contact, N.J.S.A. 2C:14-3(b), and child abuse, N.J.S.A. 9:6-3, in separate counts for each charge relating to two dates, January 30, *493 2000 (counts 1 and 3) and February 2, 2000 (counts 2 and 4). All of the charges were fourth degree offenses and the victim of each was a minor, Sally.[1]
After a jury trial, defendant was found not guilty on the counts relating to January 30, 2000, but guilty on the two counts concerning February 2, 2000. Concurrent sentences of fifteen months imprisonment were imposed on each count along with appropriate penalties. Defendant was also required to register under Megan's Law, N.J.S.A. 2C:7-2b(2), and to provide a blood sample for DNA analysis.
The facts established by Sally's trial testimony were as follows. Sally started working at a bakery in the fall of 1999, while she was in the tenth grade and sixteen years old. Defendant was employed full-time as a baker at the same bakery. She worked three to four hour shifts on Wednesday, Thursday, and Friday nights, as well as during the day on Saturdays and Sundays. She took orders from the bakery's customers, handled the cash register, and made sure that the customers received what they ordered. Defendant was Sally's supervisor and was present at the bakery during her shifts at least twice each week.
On Sunday, January 30, 2000, Sally arrived at the bakery for her shift at approximately 10:55 a.m. Defendant arrived at the bakery approximately an hour and a half later.
Sally testified that defendant called her into the back of the bakery, which was not unusual, as she often went there to clean dishes out of the sink or to get pies. On this occasion, defendant asked if he could touch her chest and she told him no. Defendant then grabbed and touched her breast with one hand, restraining her wrist with his other hand. Sally said she heard the door squeak, indicating a customer was entering the bakery, at which point she returned to the front to help the customer. Defendant left the bakery shortly thereafter.
Sally testified that she then called her friend E.T. on the telephone and told her that the defendant had grabbed her hand and touched her chest. She did not tell anyone in her family of the incident, nor did she report it to the authorities. She went to school on Monday, Tuesday, and Wednesday of that week.
Defendant arrived at the bakery on Wednesday, February 2, 2000, shortly after Sally had reported for work at 3:00 p.m. At that time, there was a cleaning crew working in the back of the bakery and defendant instructed them to hurry up, finish and leave, which they did.
After the cleaning crew left, defendant called Sally into the back of the bakery. Sally complied with defendant's request, at which time defendant asked if he could touch her breasts. When Sally said "no," defendant pulled Sally toward him and grabbed her chest. Defendant told Sally that he was "hard," grabbed Sally's hand, put it on the crotch of his sweat pants, and forced her to rub her hand up and down and left and right.
A customer then came into the bakery, and Sally went back to the front of the store. After the customer made a purchase and left, defendant called Sally back to the rear of the bakery. Notwithstanding the prior episode, she complied. Defendant again pulled Sally toward him, lifted her up so her feet were off the ground, and asked Sally if she would like to "ride" him. Sally was able to get her feet back *494 on the floor, but defendant pulled her back toward him so that her buttocks were rubbing against his erect penis.
While defendant was rubbing against Sally, he put his hands down her pants, under her underwear, and touched her vagina. Defendant had such a tight grip on Sally that, although she tried, she could not get away from him. At this time, a supplier's truck from South Jersey Paper arrived at the bakery. When defendant heard the supplier's employees, he let go of Sally and went into the rearmost part of the bakery.
Sally met with a South Jersey Paper representative, who requested that someone sign for the material that was just delivered. Sally stated that defendant was in the bakery and could sign. Defendant walked up from the back of the bakery and signed for the delivery. Sally went back to the front of the store.
Defendant called Sally back to the bakery's bathroom, and exposed his erect penis to her. He asked Sally if she would like to "suck it dry," or dry it with the towel he was holding. Sally told defendant that what he was asking her to do was "just not right." Defendant's overtures were again interrupted by a South Jersey Paper representative requesting a signature, which defendant provided. Sally was confused about whether she should stay or leave.
After defendant finished dealing with the representative from South Jersey Paper, he called Sally into the back of the bakery a fourth time. Defendant proposed that Sally meet him somewhere so that they could have sex. Sally refused. Defendant walked away and Sally telephoned her friend E.T., asking for her help. Sally could not relate the details of defendant's advances to her friend because defendant was standing near her.
Defendant called Sally into the back of the bakery yet again. Sally put the telephone down without placing her call to E.T. on hold, and told E.T. that if she was gone more than five minutes, E.T. should call for help. When Sally walked to the back of the bakery, defendant took her hand, told her she was "a cool kid" and placed a $20 bill in her hand. Sally ran back to the telephone and told E.T. about her encounter with defendant. E.T. established a conference call with Sally's mother, and Sally told her mother about defendant's behavior. Sally's mother went to the bakery to pick up Sally.
Sally also called the owner of the bakery, who is the brother-in-law of defendant, to tell him that she had to leave because of a family emergency. The owner asked Sally to stay fifteen minutes until he could get there so the store would not be left unattended. When the owner arrived, Sally's mother was at the bakery waiting. She had placed the $20 bill defendant gave Sally on the counter and told the owner that defendant "could not keep it in his pants." He was not interested in hearing about what had happened, and Sally and her mother left.
After she arrived home, Sally noticed that defendant's telephone number appeared on her caller identification equipment. Sally went to the police station later that evening and explained what defendant had done to her to Officer's Allamente and Grasso, both verbally and by a handwritten statement memorializing her oral statement.
At trial, the bakery owner was called as a defense witness. He testified that the bakery's cleaning crew was still present when he arrived at the bakery after 4:00 p.m. on February 2, 2000. When he arrived, he spoke with both members of the cleaning crew, who told him that they did not hear anyone scream, and that they did *495 not hear anything out of the ordinary. According to the owner, because there is no insulation in the walls, people in the rear of the bakery (like the cleaning crew) would be able to hear what was happening in the front of the store.
Bonnie Spector, the owner of South Jersey Paper, also testified for the defense. According to Ms. Spector, the delivery to the bakery by her company was made on February 3, 2000, not on February 2. Defendant's wife testified that defendant has a tattoo of a red devil on his right leg that would be visible if he pulled his pants down. She admitted, however, that the tattoo would not be visible if defendant had not dropped his pants to his thigh.
After considering all the evidence, the jury found defendant guilty of the criminal sexual contact and child abuse offenses relating to February 2, 2000. Defendant raises the following issues on appeal.
POINT I
THE DEFENDANT'S CONVICTION MUST BE OVERTURNED DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL
A. DEFENSE COUNSEL'S FAILURE TO INTERVIEW ESSENTIAL WITNESSES OR TO ARRANGE FOR THEIR ASSISTANCE CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL
B. DEFENSE COUNSEL'S FAILURE TO PRODUCE THE DEFENDANT'S PHONE RECORDS TO IMPEACH THE VICTIM'S CREDIBILITY CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL
POINT II
THE TRIAL COURT ERRED BY ADMITTING THE VICTIM'S ORAL STATEMENTS AND HANDWRITTEN STATEMENT INTO EVIDENCE UNDER THE EXCITED UTTERANCE EXCEPTION TO THE HEARSAY RULE
POINT III
THE VERDICT OF GUILTY IS AGAINST THE WEIGHT OF THE EVIDENCE
POINT IV
THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL
In light of our determination with respect to Point II, we find it unnecessary to address any of defendant's other arguments.
Sally arrived at the police station between 6:00 and 7:00 p.m. on February 2, 2000. She was, according to Officer Allamente, "physically upset, nervous ... [h]er hands were shaking and ... she didn't know which way to turn, it seemed." Her "eyes were puffy and red" and it appeared that she had been crying, although she was not crying at that time. The officers spoke to Sally and her mother. Allamente testified:
Out in the foyer area she told me she was assaulted by the defendant. She told us the nature of the sexual assault and she gave us a brief synopsis of what happened, at which time we decided a more detailed interview had to be conducted. We escorted her and her mother into the back room in the office and conducted a more detailed interview.
Q. When she was explaining to you in the foyer what had happened to her did her demeanor change?
A. You could hear her voice wavering. She was trying not to show that she was physically upset. She basically wanted to convey the facts of the case so that the proper action could be taken. But despite that, her age *496 wasShe's fairly young.her age showed through and she was shevery easily you could see she was upset and
Q. How old was she, do you know?
A. At the time she was sixteen.
After speaking with Sally for about an hour, the officers took her into an interview room and instructed her to write out a statement as to the events, which she did in the officers' presence. The written statement appeared identical to the prior oral statement. Sally was asked to return the next evening to provide a taped statement. When she did return, she brought a statement with her that she had typed on her home computer. That statement was also "virtually identical in content" with the oral and written statement given the day before. She then provided a taped statement which, although "almost identical in fact and content," contained more details since Sally "had time to physically collect her thoughts and she was physically calmer that night during the taped statement."
The trial judge admitted, over objection, the officers' undetailed statements concerning what Sally said orally when she first came to the police headquarters, on the basis that it was an excited utterance. N.J.R.E. 803(c)(2). At the conclusion of the State's case, both the statement written by Sally in the police station on February 2 and the statement she typed at home on her computer that evening were offered in evidence. The prosecutor proffered both statements as prior consistent statements, N.J.R.E. 803(a)(2). The judge declined to accept that basis, but instead admitted the statement written at the police station as an excited utterance. The judge rejected the admissibility of the computer-generated statement as a prior consistent statement.
As a result, Sally's detailed, six-page handwritten statement was admitted in evidence. We conclude that this ruling was in error.
We first address the admissibility of the oral statement Sally made to the officers at the police station. Evidence Rule 803(c)(2) permits the introduction into evidence as a hearsay exception "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." In this case, there was evidence that Sally was still in a state of nervousness resulting from her encounter with defendant which had ended about three hours earlier. However, the passage of time between an incident and the victim's subsequent statement does not render the excited utterance doctrine inapplicable if the victim was, in fact, "still in a state of excitement and the psychological guarantee of trustworthiness was still present." State v. Simmons, 52 N.J. 538, 542, 247 A.2d 313 (1968), cert. denied, 395 U.S. 924, 89 S.Ct. 1779, 23 L. Ed.2d 241 (1969); see also; State v. Lazarchick, 314 N.J.Super. 500, 524, 715 A.2d 365 (App.Div.), certif. denied, 157 N.J. 546, 724 A.2d 804 (1998) (statement of an assault victim made to his mother when he arrived at home not more than an hour after the attack was deemed admissible as excited utterance); State v. Bass, 221 N.J.Super. 466, 483, 535 A.2d 1 (App.Div.1987), certif. denied, 110 N.J. 186, 540 A.2d 182 (1988) (statement by a five-year-old witness to brother's murder given at hospital six hours after the event was still "spontaneous and contemporaneous"); Commonwealth v. DiMonte, 427 Mass. 233, 692 N.E.2d 45, 50 (1998).
In addition, the fact that the statement was made "in response to inquiry" does not negate its spontaneity. Simmons, *497 supra, 52 N.J. at 542, 247 A.2d 313. In State v. Baluch, 341 N.J.Super. 141, 182, 775 A.2d 127 (App.Div.), certif. denied, 170 N.J. 89, 784 A.2d 721 (2001), we noted that "the determinative element is not the precise amount of time which elapsed between the event and the statement, but rather whether the facts and circumstances reasonably warrant the inference that the declarant was still under the stress of excitement caused by the event." "The crucial element is the presence of a continuing state of excitement that contraindicates fabrication and provides trustworthiness." State v. Lyle, 73 N.J. 403, 413, 375 A.2d 629 (1977). In determining whether there was opportunity for the declarant to fabricate or deliberate, the trial court must consider "`the element of time, the circumstances of the incident, the mental and physical condition of the declarant, and the nature of the utterance (whether against the interest of the declarant or not, or made in response to questions or involuntary).' " Lazarchick, supra, 314 N.J.Super. at 522, 715 A.2d 365 (quoting State v. Williams, 106 N.J.Super. 170, 173, 254 A.2d 538 (App.Div.), certif. denied, 55 N.J. 78, 259 A.2d 228 (1969), cert. denied sub nom. Williams v. New Jersey, 397 U.S. 1057, 90 S.Ct. 1405, 25 L.Ed.2d 675 (1970)). See also State v. Rivera, 351 N.J.Super. 93, 99-100, 797 A.2d 175 (App.Div.), certif. granted, 174 N.J. 366, 807 A.2d 197 (2002). The determination of whether a particular statement was an excited utterance is very fact-specific. Lazarchick, supra, 314 N.J.Super. at 522, 715 A.2d 365.
Notwithstanding Sally's age, that she had an opportunity to speak with her mother and friend before meeting with the police, and that some three hours had elapsed, we conclude that the trial judge did not abuse his discretion in finding that Sally's oral statements qualified as excited utterances. Id. at 524, 715 A.2d 365. With respect to the admissibility of the written statement, however, we reach a different conclusion. Although the issue is one of first impression in New Jersey, it has been addressed elsewhere.
In Commonwealth v. Carmody, 799 A.2d 143 (Pa.Super.2002), the Pennsylvania appeals court upheld the lower court's finding that an assault victim's written statement given to a police officer at the station house did not qualify as an excited utterance. As in the present case, the victim had verbally related the events surrounding the assault to a police officer at the station house. Id. at 147. Again as here, the officer then took the victim into a back room at the police station and asked her to write down exactly what had happened that night. Ibid. After noting that the statement was in narrative form, all of it written and signed by the victim, the court pointed out "the written statement [had been] given subsequent to intervening events," most significantly after the witness had already given a verbal statement and only after she was taken to another room in the police station and told to make out a written statement. Id. at 148. The court concluded that "[t]hese facts militate against a finding of spontaneity.... Under these facts, we find the form of the statement, coupled with the circumstances under which it was given, preclude it from being admissible as an excited utterance." Ibid. The facts of the present case are remarkably similar to those in Carmody.
Other cases, under a variety of factual scenarios, albeit more readily distinguishable from this case, have likewise found written statements to be inadmissible as excited utterances.
In State v. Justice, 92 Ohio App.3d 740, 637 N.E.2d 85 (1994), the court held that a domestic violence victim's oral statement to the police was properly admitted as an excited utterance, but the victim's written *498 statement made to the police was hearsay and had been improperly received as evidence. Id. at 86. In Justice, the victim and her husband began arguing at approximately 6:00 a.m. At around 7:45 a.m., someone called the police station and reported a domestic disturbance at the victim's home. Ibid. Two police officers were dispatched to the home, but before they arrived there the victim had already made it to the police station. The victim was interviewed at the police station at approximately 8:15 a.m. Ibid.
According to the interviewing officer, the victim appeared "nervous," "her hand was shaking," and she seemed "upset" and "anxious or excited." Id. at 86-87. The victim proceeded to describe how she and the defendant had gotten into an argument and that he had slapped her five or six times and kicked or attempted to kick her two or three times. Id. at 87. The officer testified that at the conclusion of her oral statement she still appeared agitated, nervous, and anxious. Ibid.
Following the victim's oral statement, the police officer asked her to prepare a written statement. The victim proceeded to prepare a three-page written statement wherein she described events from the previous day and concluded with a description of defendant's physical attack on her. Ibid. The police officer entered the date and time at the bottom of each page of the written statement. The written statement was concluded at 8:45 a.m. Ibid.
In concluding that the written statement was erroneously admitted as an excited utterance, the Justice court noted that much of the victim's written statement "dealt with background to the startling occurrence rather than with the event itself." Id. at 90. While acknowledging that the inclusion of background information did not necessarily preclude a finding that the statement qualified as an excited utterance, the court nonetheless stated that its inclusion tended to show that the statement was more typical of a narrative or reflective statement than a spontaneous one. Ibid.
Sally's written statement does not appear to have the type of background information that the Justice court found significant. Her statement deals specifically with the events of January 30 and February 2 and includes no extraneous material. Thus, at least in this respect, it does not appear typical of a narrative or reflective statement.
Yet, the Justice court went on to list other factors that weighed against admission of the written statement as an excited utterance, and these factors are equally applicable to the instant matter. The Justice court stated:
In addition, Mrs. Justice's written statement was prepared after she had given her oral statement. A statement naturally becomes more reflective with repetition.
Further, although Deputy McGill testified that Mrs. Justice still appeared anxious at the conclusion of her oral statement, he was not asked any questions regarding her appearance as she completed her written statement. Additional time had passed and she was engaged in the naturally more reflective activity of writing rather than speaking. The most relevant parts of her written statement came near the end of it.

[Ibid.]
Unlike Justice, where the officer indicated the date and time at the bottom of each page of the written statement, in this case the record does not clarify just how long it took Sally to prepare the seven-page statement, and the pages of the statement itself do not answer the question. Also, although Allamente testified that he and *499 Grasso were in the room with Sally when she prepared the written statement, this was the extent of their testimony with respect to the preparation of the written statement. In other words, they did not testify that Sally still appeared to be under the influence of the exciting event at the time she was writing the statement. As Justice indicates, the lack of testimony concerning the officer's observation of the witness's demeanor while making the written statement raises a question as to the statement's qualification as an excited utterance. Sally may very well have calmed down by the time she sat down and prepared the written statement. The State did not present sufficient evidence to indicate that Sally still appeared to be under the influence of the exciting event at the time she prepared her written statement.
In State v. Dixon, 37 Wash.App. 867, 684 P.2d 725 (1984), the court held that it was error to admit into evidence as an excited utterance the written statement of the victim of a sexual assault. There, the victim was visited at her home by the defendant at approximately 6:30 p.m. The defendant asked the victim to accompany him to a nearby gymnasium to play basketball. The victim said that she would go but that she needed to change her attire first. She asked the defendant to wait in another room while she changed. Defendant did not do so, and instead entered the room while she was undressing and asked her to let him handcuff her. After she refused, a struggle ensued, and defendant subsequently grabbed the victim's breast and put his hand beneath her underwear. When the victim received a telephone call and was allowed to answer the phone, she screamed for help. After the phone was knocked from her hand, she ran from the apartment screaming. The police were summoned by a neighbor who heard the screams, and the defendant fled the apartment prior to the police's arrival. Id. at 726.
The police arrived at the apartment at approximately 7:40 p.m. and remained there for more than two hours. "During the entire 2 hours, Ms. M. was `quite upset and distraught.'" Id. at 727. The police officers described the victim as hysterical, in tears, and having a hard time breathing. Ibid. During the two hours, the officers attempted to calm Ms. M. down while simultaneously taking a written statement from her. The time indicated on the four-page statement was 8:10 p.m. Ibid.
A police officer testified that during the time she took the victim's written statement, the victim continued to be upset. Ibid. Despite defense counsel's objection, the trial judge admitted the written statement as an excited utterance. Ibid.
The court of appeals indicated that the written statement was very detailed, so much so that "[t]he statement, because of its length and completeness, would be impossible to distinguish from a statement routinely given police by crime victims." Id. at 728. The court went on to note, though, that if the victim's statement to the police "were to be admissible simply because she was `upset', virtually any statement given by a crime victim within a few hours of the crime would be admissible because many crime victims remain upset or frightened for many hours, and even days and months, following the experience." Ibid. Of course, the same may be said of the statement at issue here.
The Dixon court concluded that "[t]he statement gives every indication that, if motivated to do so, Ms. M. could have fabricated some of the details. Under these circumstances, we have no basis for finding a guaranty of trustworthiness, which is the ultimate basic ingredient which must be present in order to qualify a statement as an excited utterance." *500 Ibid. See also State v. Hansen, 133 Idaho 323, 986 P.2d 346, 350 (App.1999) (noting that admission of witnesses' written one-page narrative statement of the events as an excited utterance, where circumstances revealed that it was composed after an intervening ten-minute walk to the police station and an interview with the police officer, was harmful error, and adding that the "very fact that it is in writing suggests time and opportunity for reflective thought in its composition"); DiMonte, supra, 692 N.E.2d at 51-52 (facsimile transmission by victim eight hours after assault inadmissible as excited utterance); Pector v. County of Suffolk, 259 A.D.2d 605, 686 N.Y.S.2d 789, 790 (1999) (trial court did not err in failing to admit as an excited utterance and excluding as hearsay the written statement of a witness made thirty minutes after observing an automobile accident); State v. Fowler, 27 Ohio App.3d 149, 500 N.E.2d 390, 394 (1985) (error in admission of written statement of victim at police station found harmless); Moon v. State, 44 S.W.3d 589, 594 (Tex.Crim.App. 2001) (trial court erred in admitting as excited utterances assault victim's written statements given approximately seventy-five minutes after assault because police officer testified that although victim still appeared scared, she had calmed down to the point where she was no longer excited or upset). But see State v. Whalen, 520 N.W.2d 830, 832 (N.D.1994), (written statement given by witness to police at scene a half-hour after incident was admissible).
We conclude that Sally's written statement provided at the police station in compliance with a request by the police, does not carry sufficient indicia of reliability to qualify as an excited utterance under N.J.R.E. 803(c)(2). As the court said in DiMonte, supra, 692 N.E.2d at 50, "[b]ecause a writing is more suspect as a spontaneous exclamation than is an oral statement, the circumstances of the writing would have to include indicia of reliability even more persuasive than those required for an oral statement before we could conclude that the writing qualified as a spontaneous exclamation." We do not hold that a written statement can never constitute an excited utterance. There could well be circumstances under which the victim's continuing state of excitement or anxiety and the temporal proximity of the statement to the event would provide sufficient guarantees of trustworthiness to justify admission, see State v. Whalen, supra, or there could be that rare situation in which the victim was physically unable to provide an oral statement. However, the very nature of the reflective process involved in preparing a narrative written statement suggests that its admission would be the exception, rather than the rule.
Nor can we conclude that the admission of Sally's written statement into evidence was harmless error. While we have found that Sally's oral statements in her first encounter with the police at headquarters were admissible, in fact the officers provided no detail as to what those oral statements were. While there was testimony that the written statement was nearly identical with the oral statements, we do not believe that it would be appropriate to find admission of the written statement to be harmless because some or all of it could have been, but was not, admitted as an oral statement. More importantly, because the statement was written, it became an exhibit and went with the jury during deliberations. The statement provided a detailed, written summary of Sally's version of the events at the bakery that could have been, and likely was, reviewed by the jury at its leisure, and perhaps more than once. While it is true that, notwithstanding the statement, *501 defendant was found not guilty of the January 30 events, we cannot conclude from that result that the written statement did not have an impact on the jury in making the credibility determination upon which this case turned. Notably, the jury initially indicated a deadlock, which was followed by its split verdict, suggesting that the case was not an easy one to resolve. This was not a case like State v. Fowler, supra, 500 N.E.2d at 394, where a finding of harmless error was predicated upon the presence of "a detailed confession by defendant, as well as [the victim's] properly admitted [oral] excited utterances," or like Moss v. State, 664 So.2d 1061, 1062 (Fla. Dist.Ct.App.), review denied, 675 So.2d 928 (Fla.1996), where an abbreviated written statement was cumulative of a detailed oral statement. Accordingly, we cannot say beyond a reasonable doubt that the error did not contribute to the outcome. State v. Spruell, 121 N.J. 32, 42-43, 577 A.2d 821 (1990); see also State v. Macon, 57 N.J. 325, 340, 273 A.2d 1 (1971). Rather, we are satisfied that the error may have led the jury "to a verdict it might not otherwise have reached," State v. Alston, 312 N.J.Super. 102, 114-15, 711 A.2d 363 (App.Div.1998), or, stated differently, that it "had the clear capacity to cause an unfair result." State v. Pearson, 318 N.J.Super. 123, 135, 723 A.2d 84 (App.Div.1999).
Reversed and remanded for a new trial.
NOTES
[1] For convenience of reference, we adopt the fictitious name suggested by the State in its brief.